[Civ. No. 13530. First Dist., Div. Two. May 19, 1948.]

DICKA KLEIN, as Administratrix, etc., Plaintiff and Appellant, v. FLORENCE M. FARMER, Defendant and Appellant.

John L. McVey and Jess H. Miller for Plaintiff and Appellant.

Augustin Donovan, Louis B. De Avila and Rode, Burnhill & Rode for Defendant and Appellant.

GOODELL, J.—The decree in this case quiets the title of the plaintiff, as administratrix of the estate of William Otto Emerson, to 400 shares of Pacific Gas and Electric Company stock and 12 shares of American Telephone and Telegraph Company stock, all valued at $14,289 as of the time of decedent's death, and orders the defendant to deliver to the plaintiff the certificates evidencing the stock. At the same time it

awards the defendant a money judgment for $8,855 against the estate, less an offset of $928 representing dividends collected by her. Both sides have appealed, and it will avoid confusion to refer to the appellant administratrix as the plaintiff, and to the appellant Florence M. Farmer as the defendant.

At the time of decedent's death the certificates evidencing the 412 shares, endorsed to defendant in decedent's handwriting and contained in a sealed envelope, were in the defendant's safe deposit box where they had been for almost seven years, and they have been in the defendant's (or the county clerk's) possession throughout this litigation. The same envelope contained a deed, signed and acknowledged by decedent, conveying to defendant that portion of decedent's real property near Hayward on which his home stood. It also contained a letter from decedent to defendant dated April 9, 1934.

After decedent's funeral defendant opened the envelope, recorded the deed, and had the stock transferred into her own name. It was while it stood in her name that the dividends amounting to $928 were paid to her.

Soon after decedent's death Dicka Klein, as the grantee of her mother (who was decedent's sister and sole heir at law) sued this defendant and George A. Gray (defendant's former husband) to quiet title to the home place near Hayward. Defendant asserted title to the parcel described in her said deed. The court held that there had not been a sufficient legal delivery of the deed and entered a decree quieting the plaintiff's title, which was affirmed on appeal in *Klein* v. *Farmer,* 57 Cal.App.2d 542 [135 P.2d 21].

The present case, which deals only with the stock, has been tried twice. On the first trial the court decided in plaintiff's favor, but the judgment was reversed in *Klein* v. *Farmer,* 70 Cal.App.2d 51 [160 P.2d 30].

Decedent died on December 24, 1940, at the age of about 85 years. He had been badly crippled for many years and walked with great difficulty. He had never married. He and his mother had lived at the home place, and when she died in 1927 that property and the stock in question (and other property) went to him. He had never engaged in any gainful occupation. Ornithology was apparently his chief interest and he did some writing on that subject. He did some painting and sketching as well.

Defendant had been a close friend of decedent and his mother for some years. In 1932, when decedent was about 77 and living alone, he asked her to keep house for him. For some years she had been a real estate broker, notary public and public stenographer, with an office in her home. She agreed to work for him from 10 a. m. to 4 p. m. five days a week, for which he paid her $40 a month. This arrangement enabled her to continue with her business to a limited extent, before 10 and after 4, and some of her own work was done in decedent's home.

On April 9, 1934, a more definite arrangement was made. Defendant then agreed to work from 9 a. m. to 5 p. m. five days a week and to give up her business, and she did give it up at once. Decedent on that day and in defendant's presence placed the endorsed certificates and the deed in the envelope and sealed it with some stickers containing his name and address. Defendant testified that she knew at the time that the certificates were for these 412 shares, but did not know what they were worth, except that decedent told her they would yield about $600 a year.

Defendant testified that many times before April 9, 1934, decedent had said to her:

"Florence, if you will give up the business completely and give me your full time from nine to five and what time I might need you after five, I will give you a deed to part of my property,—the home; and I will also give you 400 shares of P. G. & E. and 12 shares of the telephone stock; that will give you an income of around $50.00 a month; and you will have the home; . . . I will make out a deed to the property and I will also sign the stock to you and give it into your possession—." She testified that decedent had offered her the deed in 1933 and that in April, 1934, when he finally handed her the envelope containing the stock and the deed he said: " 'You take this envelope and put it in your safe deposit box——' he said, 'it is yours.' He said, 'I am going to keep my part of the bargain, if you keep yours and as long as you stay with me it is yours.' He says, 'If you ever leave me, why, you are to return it to me in the same condition——' and on the front of the envelope was written, 'To be opened at my death and put of record immediately.' " She put the envelope in her safe deposit box and there it remained until after decedent's death.

In July, 1939, the arrangement was changed so that the defendant should devote practically all her time to decedent.

A room for her was added to the home, and she lived there night and day except Sundays, which she spent with her married children. When this full-time arrangement was made the monthly payment was increased from $40 to $65 but the arrangement made in April, 1934, as to the stock and the deed was not disturbed.

The services which defendant rendered from April, 1934, to the time of decedent's death were about as follows: she did the housework; cooked and served decedent's meals; bathed him, shaved him, and cut his hair; dressed injuries on his body which were draining; drove him in his automobile wherever he wanted to go, helping him in and out; when he visited art galleries or such places, she helped him from the automobile into his wheel-chair and wheeled him around in it; when he wanted to sketch or paint she drove him into the hills. She handled his correspondence; typed his articles on technical subjects; catalogued his books and papers. Several witnesses testified that he often expressed himself as highly pleased with her services, and had said that whenever she was away he missed her and did not know what to do without her help, and that he was very fond of her.

Defendant's children on numerous occasions urged her to quit her employment because the work was too heavy and because she did not have to work anyway. Her reply invariably was that decedent had turned over the stock and deed to her, thereby performing his part of the bargain, and she proposed to carry out her part, and would not go back on her word however arduous and unpleasant the work might be.

It so happened that at the time of decedent's death and for three or four days before, defendant was ill and confined to her own home. The record, with this one exception, shows no interruption in defendant's services and no inattention or neglect on her part over the entire period. Even when she suffered a sprained ankle, and at another time a broken arm, she kept on with her duties.

None of defendant's testimony respecting the foregoing matters is contradicted and most of it is corroborated. Practically the only dispute in the case arose out of the following circumstances: when defendant opened the envelope she found within it, according to her testimony, a letter reading as follows: "April 9, 1934, to Florence M. Farmer. Dear: All my household furniture, books, pictures, curiosities and everything contained in my home are hereby given to you

and are to be under your full control, to be disposed of as you may see fit. This gift is in appreciation of your care and kindness to myself and my mother. It is to be understood that I am to have the use of these personal belongings during my lifetime. W. O. Emerson.'' While the property mentioned therein is not now involved, the letter is pertinent because it helps to fix the time of the turning over of the stock to defendant and shows the decedent's high regard for her. Mr. McVey, plaintiff's attorney, testified that he telephoned to defendant shortly after the funeral to inquire whether she had a will and that she replied in the affirmative and added that she had received it in the mail but she did not know the person by whom it had been mailed. This the defendant flatly denied. Her version was that she told him she found a letter (not a will) in the envelope and that he could examine it. He later examined it at the office of her attorneys, who supplied him with a copy. There is no other conflict of any importance in the whole record. With respect to this conflict the court found that ''Nothing contained in the foregoing findings is intended as a finding that the testimony of John L. McVey, . . . was untruthful in any respect; and said testimony was believed by the Court to be true in every respect.''

The complaint alleges that at the time of decedent's death he was the owner of the 412 shares but that defendant claimed them as her own. In her answer defendant, in addition to denying plaintiff's title, alleges ultimate facts substantially in accord with the facts narrated above, concluding with the claim that ''the attempt of plaintiff to deprive defendant of the said stock [is] a fraud upon the defendant,'' which is a plea of estoppel.

Defendant also set up an alternative cause of action based on a contingent creditor's claim against the estate, for the difference between the payments made to her each month and the full value of her services, on which she could rely in case of a judicial determination that she was not the owner of the stock.

On all the facts pleaded in the estoppel count the court found in defendant's favor but concluded that the plaintiff was ''not precluded or estopped from asserting ownership of said stock . . .'' The court then gave judgment for $8,855 on said count for the reasonable value of defendant's services over and above the $40 a month which she received for 63 months and the $65 a month for 17½ months.

The defendant contends that she is entitled to a favorable decision on her plea of estoppel and that the money judgment "only partially remedies the injustice of depriving her of that for which she worked." She invokes the rule, codified in section 1962, subdivision 3, Code of Civil Procedure, that "Whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such declaration, act, or omission, be permitted to falsify it." She relies also on the rule of *Dickerson* v. *Colgrove,* 100 U.S. 578, 580 [25 L.Ed. 618], (repeatedly quoted in the California cases) as follows: "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both." To this the court added: "This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault." It is sufficient to remark that here the estoppel is invoked purely defensively, in opposition to the estate's assertion of title to the stock.

 We are satisfied that this case comes within the rules just quoted and that it is not essentially different from *Seymour* v. *Oelrichs,* 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154]. Because of the defendant's reliance on what the decedent said and did, the course of her life for almost seven years was substantially altered, and in our opinion she is entitled to the full measure of equitable relief under her plea of estoppel. In *Seymour* v. *Oelrichs* the plaintiff was a captain of police in San Francisco. Messrs. Fair and Oelrichs, representing the Fair estate, entered into negotiations with him looking to his employment under a 10-year contract at $300 a month. Fair and Oelrichs knew that by accepting this new position Seymour would lose his police pension rights, wherefore a written contract took on added importance. Fair was busy winding things up preparatory to a trip abroad and told Seymour "Now, in regard to this contract, you leave that stand until I get back, and I will give you the contract" and when Seymour pressed him for it before leaving, Fair told him not to be afraid, it would be all right. Oelrichs told him substantially the same thing.

They wanted him to start working at once. Relying on these promises he resigned and entered the employ of the Fair estate on June 1, 1902. Two months later Fair was accidentally killed in France and the contract was never drawn up. After two years Seymour was discharged and he sued for his salary for the remainder of the 10-year term, less his earnings elsewhere. The court held that the conduct and promises of the defendants, and Seymour's change of position in reliance thereon, estopped the Fair estate from pleading the statute of frauds; that if the court permitted them to take advantage thereof it would work a fraud on Seymour.

The estoppel just discussed was not based on the conventional representation or assurance as to an existing or past fact or state of things, but solely on the promises of Fair and Oelrichs to give Seymour a written contract in the future, with no consideration whatever moving from promisee to promisors.

In 3 Pomeroy's Equity Jurisprudence (5th ed.), section 808b this is said on the subject of ''promissory estoppel'':

''The general rule stated in a preceding section (sec. 808) that in order to furnish the basis of an estoppel, a representation or assurance must relate to some present or past fact or state of things, as distinguished from mere promises or expressions of opinion as to the future, must be qualified. There are numerous cases in which an estoppel has been predicated on promises or assurances as to future conduct. Thus an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise be relied upon and in fact it was relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice. The name 'promissory estoppel,' has been adopted as indicating that the basis of the doctrine is not so much one of contract, with a substitute for consideration, as an application of the general principle of estoppel to certain situations. On the other hand, it has been said by good authority that the doctrine of promissory estoppel has been adopted as the equivalent of consideration, or substitute for consideration. It is important to bear in mind that the doctrine is much older in its origin and applications than the terminology now employed to describe it. Illustrative cases abound in the reports, especially since the formal embodiment of the principle by the American Law Institute in the Restatement of the Law of Contracts, as follows:

'' 'A promise which the promisor should reasonably expect

to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise' . . .''

Illustrative of the statement "that the doctrine is much older in its origin and application than the terminology now employed to describe it" are the cases cited *inter alia* by the editor, namely *Dickerson* v. *Colgrove, supra,* and *Seymour* v. *Oelrichs, supra.* Indeed 13 years before the Seymour case, our Supreme Court in *Carpy* v. *Dowdell,* 115 Cal. 677, 687 [47 P. 695] said: ". . . the principle of equitable estoppel does not rest upon a consideration moving to the party estopped" citing *Van Syckel* v. *O'Hearn,* 50 N.J.Eq. 173, 175 [24 A. 1024].

In the latter case the holder of a mortgage promised to withhold its enforcement for one year, on the strength of which O'Hearn purchased the property against which the mortgage lien stood. When foreclosure was commenced within the year the plaintiff was held to his promise. The chancellor, after conceding that ordinarily a consideration must be shown to support a promise, said: "But a court of equity will sometimes prevent parties from disregarding their promises, even when no consideration has accrued to them upon the making of such promise. If a party asking the aid of the court waive strict performance of his contract and makes promises to the defendant upon which the latter has acted and altered his position, and it should appear to the court to work a hardship to the defendant to allow the complainant to withdraw his waiver, a court of equity always applies the doctrine of estoppel. In such case, although no consideration or benefit accrues to the person making the promise, he is the author or promoter of the very condition of affairs which stands in his way; and when this plainly appears, it is most equitable that the court should say that they shall so stand. [Citations.]''

Section 1962 (subd. 3), Code of Civil Procedure, *supra,* speaks of *a declaration, an act, or an omission* which leads "another to believe a particular thing true." In this case you have both a declaration and an act: " 'You take this envelope and put it in your safe deposit box . . . *it is yours* . . . I am going to keep my part of the bargain, if you keep yours and as long as you stay with me *it is yours'* . . ." (Emphasis added.) Although this may not have constituted an absolute and unqualified *legal* delivery, equity, under the facts and circumstances shown by this record, should not permit the defendant's claim to this stock to be defeated. We agree

with defendant's statement that in handing the endorsed certificates to the defendant decedent "used language which, regardless of legal refinements as to the exact time when title was to pass, must necessarily have been calculated to convey to the defendant the impression that if she continued in his service until his death, she would be the unqualified owner of the stock. Believing that she had been provided for, and relying on that belief, the defendant carried out her part of the agreement by discontinuing her business and sacrificing the income she had derived from it, and by assuming for [almost] the ensuing seven years, the arduous and often unpleasant duties involved in the care of an aged and crippled person. In addition, during the latter part of the period, she gave up her normal home life, including the frequent visits that she had previously enjoyed with her children." Unlike most cases of estoppel the promisor in this case did everything he thought necessary to make good his promise.

In examining the several reasons advanced by plaintiff why defendant has not made out a case of estoppel, it should be borne in mind that in this lawsuit plaintiff is the actor, suing to quiet title to the stock and to recover it for the estate. Plaintiff is out of possession of the certificates which evidence ownership; "paper title" is in defendant and the certificates are in her possession (or the court's). If plaintiff is to prevail she must establish a superior title in herself. Against plaintiff's claim of title defendant pleads estoppel purely as a shield, seeking to retain as her own, stock which the decedent admittedly endorsed and turned over to her and which he could never have conceivably recovered back as long as defendant continued (as she did) faithfully in his service.

1. One of plaintiff's principal contentions is that defendant has not shown an adequate consideration for decedent's promise, but it is already clear that in cases such as this consideration is not necessarily a factor. Moreover, defendant does not seek specific performance, hence plaintiff's authorities on that subject are not in point.

2. As to defendant's pleading: she alleged all the facts and circumstances on which she relies, and as long as the estoppel is pleaded "so that the opposite party may know its nature" (*Burrow* v. *Carley*, 210 Cal. 95, 103, 104 [290 P. 577]) that is sufficient.

3. Several arguments of plaintiff are predicated on something which never happened. Let it be assumed that it was part of the understanding between decedent and defend-

ant that *if she did not remain with him until his death* he would pay her (a) the full value of her services theretofore rendered, or (b) what she had lost in discontinuing her real estate business, or both. Plaintiff argues that this shows that she could be compensated in money, hence her case does not commend itself to a court of equity. The fact is that she remained to the very end, and the arrangement for money compensation (which at best was alternative and substitutional) was never, therefore, brought into operation.

 4. Plaintiff also argues that although defendant claims stock of considerable value (over $14,000), she made no promise binding her to stay, and could have quit at any time. It makes no difference whether she made a bilateral promise to decedent to stay, in exchange for his promise, or whether the arrangement was purely unilateral. The fact remains, as just pointed out, that she did stay as long as decedent lived, which was precisely what was contemplated when the stock was turned over to her.

 5. Plaintiff claims that defendant did not prove that she gave up something of substantial value in discontinuing her real estate business, and that a finding that she did so is conspicuous by its absence. She testified that her business had yielded her about $200 a month. Her former husband corroborated her testimony that she had had a going business, but even if all defendant's testimony on the subject remained uncorroborated it would still be sufficient evidence to prove the fact (Code Civ. Proc., § 1844). There can be no question that defendant did give up her business about April 9, 1934. Wholly aside from that, however, her change of position in leaving her family, devoting herself entirely to decedent's service, and doing the kind of work she had to do for almost seven years, would alone suffice without any reliance at all on the giving up of her business. For this reason, if for no other, corroboration of what defendant's earnings had been in the real estate business is neither important nor material.

6. Plaintiff's contention that there is no "finding of substantial injury, or any reasonable evidence to sustain such finding" is difficult to understand or follow in view of the record in this case.

In the first case (*Klein* v. *Farmer*, 57 Cal.App.2d 542 [135 P.2d 21]) plaintiff sued as grantee of her mother (not as executrix) to quiet title to decedent's home place. Although defendant's deed and the stock certificates were in the same envelope, the issues there were much narrower than those in

this case, and defendant's claim under the deed came to an end by that decision.

In the present case the court awarded defendant $8,855 on her alternative claim, but she is dissatisfied with that judgment because it denies her the stock itself.

Plaintiff, also, is dissatisfied, and has appealed from that part of the judgment which awards the $8,855, contending (a) that defendant's demand is barred by the statute of limitations; (b) that the event which would mature such demand had not arrived; (c) that there was no competent evidence of the reasonable value of defendant's services and the court could not take judicial notice as to such value; (d) that certain offsets should have been allowed, and (e) that defendant failed to show a compliance with the Welfare and Institutions Code.

Our conclusion herein calls for a reversal of the judgment which quiets plaintiff's title to the stock and at the same time awards defendant the $8,855. It calls, also, for a judgment in defendant's favor on her defense of estoppel, thereby automatically eliminating her alternative money demand, for "she cannot enjoy both remedies" (*Klein* v. *Farmer,* 70 Cal.App.2d 51, 60 [160 P.2d 30]). It follows of course that there is no need to discuss any of the points, enumerated above, raised on plaintiff's appeal.

The findings closely follow defendant's pleading of estoppel in her fifth defense, and they are sufficient as far as they go. They conclude, however, that the plaintiff is "not precluded or estopped from asserting ownership of said stock. . ." As already indicated, the record in this case calls for a finding or conclusion that the plaintiff *is* so precluded and estopped. The trial court is directed, therefore, to change the findings in that respect and in any other respect which it may deem proper, not inconsistent with this opinion; likewise, of course, to change the conclusions of law accordingly, and thereupon to enter a decree quieting defendant's title to the stock, awarding her the dividends accrued thereon since decedent's death, and her costs.

The judgment is reversed (on defendant's appeal) with the directions just stated. Defendant to recover her costs on appeal.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied June 18, 1948, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied July 15, 1948.