[Civ. No. 31700. First Dist., Div. Two. Oct. 2, 1974.]

JOHN G. SINCLAIR, JR., Plaintiff and Respondent, v.
AQUARIUS ELECTRONICS, INC., Defendant and Appellant.

COUNSEL

Warren, Rubin & Chickering, Herbert Rubin, Patrick, Buchanan & Phillips and Peter S. Buchanan for Defendant and Appellant.

Petersen, Lonergan & Larson and James L. Larson for Plaintiff and Respondent.

OPINION

**KANE, J.**—Defendant Aquarius Electronics, Inc. ("Aquarius") appeals from a judgment obligating it to make payments to plaintiff under a royalty agreement.

In November 1969 Frank Bakerich ("Bakerich"), the majority shareholder of Aquarius, approached plaintiff at his home in Little River, California. Bakerich had heard that plaintiff, an electronics researcher and consultant, was working with brain waves and was interested in the commercial exploitation of his experiment. Plaintiff demonstrated the workability of the idea on a large device which converted brain waves into audible form. Bakerich, who listened to his own brain waves on this device, was impressed and was most anxious to implement plaintiff's idea of creating and putting into commercial production miniaturized battery-operated devices which would convert brain waves into audible form.

In addition to the foregoing, the parties also discussed other matters during the preliminary negotiations. Thus, Bakerich advised Mr. Sinclair that Aquarius had only $5,000 capital for the contemplated production. In countering plaintiff's suggestion to form a partnership or to pay him in cash for the idea, Bakerich recommended that the payments be in the form of royalties based on net sales. The question of patentability was also discussed prior to the execution of the contract. Although it appeared to both parties that the idea was probably not patentable, Bakerich expressly represented to plaintiff that patenting was expensive and unnecessary in order to enter into the type of agreement contemplated by the parties.

The agreement embodying the understanding of the parties was entered into on December 5, 1969. It emphasized that Aquarius wished to encourage people to submit their scientific ideas to Aquarius for adoption even though such ideas were not patentable and were well known to others or Aquarius and provided that the subject matter of the agreement consti-

tuted a confidential disclosure; moreover, Aquarius agreed to pay the inventor a royalty of 4 percent of the net sales price received for all devices embodying the subject matter of the contract.[1]

In compliance with the provisions of the agreement, on December 28, 1969, plaintiff submitted to Aquarius Exhibit A, consisting of "a battery operated electronic device for converting the brain signal known as alpha rhythm to audible form for the purpose of self-training of voluntary control of the alpha rhythm" and a schematic diagram of its circuitry. The device was tested by Bakerich and was accepted by him for Aquarius. After several days of experimentation, certain difficulties developed in the operation of the device. Plaintiff was asked to, and did, make additional improvements (engineering changes in the circuitry and components, etc.) to make the device suitable for mass commercial production. The changes were accepted by Aquarius.

The first devices embodying plaintiff's idea were sold by Aquarius as Alpha phone No. 101. Subsequently, Aquarius effected minor changes in the instrument and sold them as Alpha phone Nos. 102, 102-A, 102-B and 102-T. The idea of converting brain waves into audible form by way of a portable device proved to be a smashing success arousing international

---

[1] The agreement read in pertinent part as follows: "WHEREAS, *Aquarius wishes to encourage those persons having* specific *ideas with respect to scientific* and educational *apparatus to submit them to Aquarius for evaluation, with a view toward adopting such ideas* as have merit, and embodying them in scientific and educational apparatus which may be manufactured and sold by AQUARIUS and

"WHEREAS, *it is recognized that some of those ideas may be patentable, while others are not,* and further *that many of the ideas submitted may be well known to others, or already considered by Aquarius, or generally available to the public;*

"Now, THEREFORE, in the light of these premises, and for and in consideration of the sum of one dollar (1.00), receipt of which is hereby acknowledged by INVENTOR, and other good and valuable considerations, receipt of which is also acknowledged, the parties have agreed as follows:

"*The idea* or invention *which has been submitted to Aquarius* and *constitutes the subject matter of this agreement* is described in full in Exhibit A, attached hereto (hereinafter referred to as 'subject matter').

"It is agreed between INVENTOR and AQUARIUS that *the submission of said subject matter* to AQUARIUS *shall constitute a confidential disclosure.*

" . . . . . . . . . . . . . . . .

"*Aquarius agrees to pay Inventor a royalty of 4% of the net sales price received by Aquarius for all devices embodying said subject matter,* with royalties being payable quarterly each year covering sales made during the preceding quarter, and each such payment shall be accompanied by a statement from AQUARIUS indicating the number of devices sold and the net sales price received therefrom. Net sales price shall be construed to mean the price actually received by AQUARIUS, less freight, returns, allowances, and taxes directly applicable to the sale of such goods." (Italics added.)

interest. Up to the time of trial Aquarius had sold about $50,000 worth of Alpha phones. Nonetheless, in a flagrant violation of the royalty provisions of the agreement, Aquarius paid only $36 in royalties to plaintiff and the sum of $604.05 for his engineering services. It is also uncontradicted that while plaintiff has not filed a patent application for his device, Aquarius, in the face of its prior representation that the subject matter was not patentable, filed a design patent application on January 18, 1971, for the basically same device incorporating plaintiff's idea.

In this action brought for accounting and damages the trial court found that the disclosure of the idea to Aquarius constituted a trade secret and that the agreement providing for royalty payments was valid and enforceable. Accordingly, Aquarius was ordered to pay plaintiff the sum of $1,964 representing the 4 percent royalties accrued on the net sales made up to the time of trial, and to render quarterly accounting and payment of the 4 percent royalties upon all devices to be sold in the future.

On appeal appellant attacks the judgment of the trial court on three grounds. It contends that the judgment below is erroneous because (1) the disclosure of plaintiff's idea does not constitute a trade secret within the meaning of the law; (2) the devices produced by Aquarius do not directly conform to plaintiff's invention and therefore the royalty provisions of the contract are inoperative; and (3) the agreement is unenforceable under prevailing federal law (*Sears, Roebuck & Co.* v. *Stiffel Co.* (1964) 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784]; *Compco Corp.* v. *Day-Brite Lighting* (1964) 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779]; *Lear, Inc.* v. *Adkins* (1969) 395 U.S. 653 [23 L.Ed.2d 610, 89 S.Ct. 1902]).[2]

Appellant's first contention that plaintiff's idea did not constitute a trade secret, requires just brief consideration. ■ It is now settled that *a trade secret may consist of any* formula, pattern, *device* or compilation of information *which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors* who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device or list of customers (4 Rest., Torts, § 757, com. b; see also *By-Buk Co.* v. *Printed Cellophane Tape Co.* (1958) 163 Cal.App.2d 157, 166 [329 P.2d 147]; *Ungar Electric Tools, Inc.* v. *Sid Ungar Co.* (1961) 192

[2]In a posthearing brief filed with the court's permission after oral argument, appellant claims that the judgment of the lower court is overly broad and unsupported by evidence and that it should therefore be reversed or remanded to limit the royalty payments to those devices that are exactly duplicative of the working model and the schematic diagram delivered by plaintiff to appellant.

Cal.App.2d 398, 403 [13 Cal.Rptr. 268] (disapproved on other grounds in *Nichols* v. *Hast* (1965) 62 Cal.2d 598, 601 [43 Cal.Rptr. 641, 400 P.2d 753])). The cases emphasize that although a trade secret may be a device or process which is patentable, patentability is not a condition precedent to the classification of a trade secret. Thus, it has been said that a trade secret may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement on a machine or device. Novelty and invention are not requisite for a trade secret as they are for patentability (*Futurecraft Corp.* v. *Clary Corp.* (1962) 205 Cal., App.2d 279, 290 [23 Cal.Rptr. 198]). In harmony with these precepts, it has been held that a trade secret in the broad sense consists of any unpatented idea which may be used for industrial and commercial purposes (*Painton & Company* v. *Bourns, Inc.* (2d Cir. 1971) 442 F.2d 216, 222).

The instant case makes it unquestionable that plaintiff's idea clearly qualifies as a trade secret under either or both of the foregoing definitions. The portable device converting brain waves to audible form was, to say the least, a mechanical improvement on the previous stationary equipment used in laboratories. In addition, the device was put to mass commercial production in appellant's business providing it opportunity to gain advantage over its competitors. Under these circumstances, appellant's claim that the inventor did not utilize the device in *his* own business is entirely immaterial and has no bearing whatsoever on the issue at hand.

█ Appellant's next argument, that the contract provisions are ineffective because the devices produced by appellant display some minor variations, is likewise ill-founded. Although undeniably some minor changes were effected on Alpha phones Nos. 102, 102-A, 102-B and 102-T, the record is clear that all the devices produced and sold by appellant functioned substantially the same way and accomplished substantially the same result. As the contract itself underlined, the subject matter of the agreement was the *idea* submitted to and accepted by Aquarius, *not the form* in which the idea was carried out. Thus, what was said in *Graver Mfg. Co.* v. *Linde Co.* (1950) 339 U.S. 605, 607 [94 L.Ed. 1097, 1101-1102, 70 S.Ct. 854], is equally applicable here: "One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form."

However, appellant's assertion that the royalty agreement at bar is unenforceable because it is violative of the federal patent law and policy enunciated in *Sears, Roebuck & Co.* v. *Stiffel; Compco Corp.* v. *Day-Brite*

*Lighting,* and *Lear, Inc.* v. *Adkins,* all *supra, is* a serious question which requires detailed attention and analysis.

As has been pointed out; at the core of the dispute are the competing demands of the common law of contracts and the federal law of patents. While the law of contracts forbids a purchaser from repudiating his promises simply because he later becomes dissatisfied with the bargain, the federal law requires that *all ideas in general circulation* be dedicated to the common good, unless they are protected by a valid patent (*Lear, Inc.* v. *Adkins, supra,* at p. 668 [23 L.Ed.2d at pp. 621-622]; see also *Sears, Roebuck & Co.* v. *Stiffel Co.; Compco Corp.* v. *Day-Brite Lighting;* both *supra*).

In resolving these conflicting interests, we must draw a careful distinction between patents and the unpatented or unpatentable secret ideas. On the one hand, in order to grant a patent, genuine invention or discovery must be demonstrated (35 U.S.C. §§ 101-103). Once issued, the patent accords the grantee a monopoly for the statutory period (35 U.S.C. § 154) and when the patent expires the monopoly created by it expires also, and the right to make the article passes to the public (*Sears, Roebuck & Co.* v. *Stiffel Co., supra,* at p. 230 [11 L.Ed.2d at p. 666]). ▪ On the other hand, a know-how or trade secret does not necessarily include novelty; it may relate to engineering detail, or mechanical improvement and may be a process, compilation or device which was clearly anticipated in the prior art (*Futurecraft Corp.* v. *Clary Corp., supra;* 4 Rest., Torts, § 757, com. b). And although a trade secret does not give its owner any monopoly and once contracted away is subject to being copied, the inventor is entirely free to keep his idea secret and not to divulge it to the general public (*United States* v. *Dubilier Condenser Corp.* (1933) 289 U.S. 178, 186 [77 L.Ed. 1114, 1117-1118, 53 S.Ct. 554, 85 A.L.R. 1488]; *Painton & Company* v. *Bourns, Inc., supra,* at p. 225).

▪ The avowed aim of the patent law, of course, is to promote invention while preserving free competition (*Sears, Roebuck & Co.* v. *Stiffel Co., supra,* at pp. 230-231 [11 L.Ed.2d at pp. 666-667]). However, due to the differing nature of a patent and a trade secret the very same policy goal can be attained in a different way. Since a patent automatically becomes public property at its expiration, any arrangement (by state law as in *Sears* and *Compco* or by private agreement as in *Lear*) which would extend or prolong the monopoly set out by the patent law would be a serious encroachment thereon and must be prohibited. However, as pointed out earlier, a trade secret is private property and belongs in the public domain if, and only if, the inventor sees fit to divulge it. It requires no lengthy

elaboration that if the inventor whose discovery is not patentable is prevented from licensing for royalties, he will hardly have any reason or incentive to uncover his idea. It follows that in the case of a trade secret the policy goal described above can be achieved the opposite way, namely, by honoring the licensing agreement and *enforcing its royalty provisions as between the parties.* ■ It bears repeating that the trade secret agreement **is effective only between the contracting parties and by no means** constitutes a bar to free copying by others who independently discover the idea. ■ In short, while a prohibition of licensing or a failure to enforce the licensing agreement containing a trade secret or know-how would be counterproductive, deterring research and development, its faithful enforcement is in full harmony with both (1) the patent policy favoring free competition, dissemination of ideas and maximum utilization of intellectual resources (84 Harv.L.Rev. at pp. 481-482 (1970)), and (2) the general rule of contract law which mandates the enforcement of a contract made at arms' length and prefers leaving the parties where their bargain has placed them (cf. 46 N.Y.U. L.Rev. at pp. 30-34 (1971)).

For the foregoing reasons we hold that neither.the general considerations **of public policy nor the dictates of federal patent law constitute sufficient** basis for declining to enforce the royalty provisions of the trade secret agreement in question. The validity of agreements for the sale or license of trade secrets has been upheld in countless cases in California and elsewhere (cf. *Davis* v. *Kittle Mfg. Co.* (1933) 134 Cal.App. 254, 267 [25 P.2d 253]; *Imperial Chem. Indus. Ltd.* v. *National Distillers & Chem. Corp.* (2d Cir. 1965) 342 F.2d 737; 5 Williston, Contracts (1937 ed.) § 1646). As the court pointed out in *Painton & Company* v. *Bourns, Inc., supra,* an analogous case: "In thousands of contracts businessmen have divulged such secrets to competitors, dealing at arms' length and well able to protect themselves, on the faith that mutually acceptable provisions for payment, for the preservation of confidentiality, and for the return of the secret information on termination or default will be enforced by the courts." (P. 225.) We are in full agreement with the court that, save on a clear showing that it is inconsistent with other rules of higher sanction and in the absence of empirical evidence of harm, a settled rule of contract on which so much has been staked should not be overturned.

We are reinforced in our view by both the holding and the underlying **rationale of** *Kewanee Oil Co.* v. *Bicron Corp.* **(1974) 416 U.S. 470 [40 L.Ed.2d 315, 94 S.Ct. 1879], a case recently decided by the United States** Supreme Court. In *Kewanee,* petitioner brought an action seeking injunctive relief and damages for misappropriation of trade secrets. The federal district court, applying the Ohio trade secret law, granted a permanent

injunction.. The Court of Appeals for the Sixth Circuit reversed, based upon its determination that the Ohio trade secret law was in conflict with the federal patent law. In reversing this latter judgment, the United States Supreme Court held that the Ohio trade secret law is not preempted either partially or *in toto* by the federal patent law. In its reasoning the Supreme Court underscored that the patent policy of encouraging invention is not disturbed by the existence of another form of incentive. Trade secret law **encourages invention in areas where patent law does not reach, the high** court noted, and therefore the two systems are not and never would be in conflict. "Trade secret law and patent law have coexisted in this country for over one hundred years. Each has its particular role to play, and the operation of one does not take away from the need for the other. Trade secret law encourages the development and exploitation of those items of lesser or different invention than might be accorded protection under the patent laws, but which items still have an important part to play in the technological and scientific advancement of the Nation. *Trade secret law promotes the sharing of knowledge, and the efficient operation of industry; it permits the individual inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it."* (*Kewanee Oil Co.* v. *Bicron Corp., supra,* 416 U.S., p. 493 [40 L.Ed.2d, p. 332], italics added.)

The court was also eager to point out that *the holder of a trade secret would not likely share his secret with a manufacturer who cannot be placed under binding legal obligation,* and the result would be to hoard rather than disseminate knowledge. The court stated, "Instead, then, of licensing others to use his invention and making the most efficient use of existing manufacturing and marketing structures within the industry, the trade secret holder would tend either to limit his utilization of the invention, thereby depriving the public of the maximum benefit of its use, or engage in the time-consuming and economically wasteful enterprise of constructing duplicative manufacturing and marketing mechanisms for the exploitation of the invention. *The detrimental misallocation of resources and economic waste* that would thus take place . . . *cannot be justified by reference to any policy that the federal patent law seeks to advance."* (416 U.S., pp. 486-487 [40 L.Ed.2d, p. 328]; italics added.)

Although *Kewanee* was dealing with the enforceability of state trade secret law, it is obvious that the broad policy principles laid down therein are applicable with equal, if not greater, force to a private contract where the licensee voluntarily assumes that in return for gaining possession over the trade secret he is going to pay the agreed upon consideration to the inventor. In its supplemental brief appellant nonetheless insists that neither *Kewanee* nor *Painton* is applicable to the present case. It contends that

both *Kewanee* and *Painton* apply only to trade secrets or other secret ideas. The invention at hand, it is argued, does not comprise any secret, because marketed matters which are completely disclosed by the goods themselves cease to be secret, belong in the public domain and cannot be removed therefrom by action of the state (*Lear, Inc.* v. *Adkins; Sears Roebuck & Co.* v. *Stiffel Co.; Compco Corp.* v. *Day-Brite Lighting;* all *supra*). Appellant's argument is a *non sequitur.*

It is well recognized that a trade secret does not offer protection against discovery by fair and honest means such as by independent invention, accidental disclosure or by so-called reverse engineering, that is, starting with the known product and working backward to devine the process (*National Tube Co.* v. *Eastern Tube Co.* (1903) 69 Ohio St. 560 [1 Ohio L.R. 661, 70 N.E. 1127]). However, as underlined in *Kewanee*, the policy that matter once in the public domain must remain in the public domain is not incompatible with the existence of trade secret protection. *An invention may be placed in public use or on sale without losing its secret character (Painton & Company* v. *Bourns, Inc., supra,* at p. 224, fn. 6; *Metallizing Engineer. Co.* v. *Kenyon Bearing & A.P. Co.* (2d Cir. 1946) 153 F.2d 516, 520 (cert. den. (1946) 328 U.S. 840 [90 L.Ed. 1615, 66 S.Ct. 1016]); but, by definition, a trade secret is something which has not been placed in the public domain (*Kewanee Oil Co.* v. *Bicron Corp., supra,* 416 U.S., p. 484 [40 L.Ed.2d, p. 327]).

■ The proposition that a secret idea does not lose its secret character by the sole fact that the device embodying the idea has been marketed has support not only in law, but also in reason and logic. As repeatedly emphasized before, the very distinction between a patented and an unpatented secret idea is that the latter is freely copied and the secret incorporated in the instrument may be uncovered by reverse engineering. To adopt appellant's view that the free copying of a device should be held equivalent to the cessation of the secret embodied therein would render the protection provided by the trade secret law or a private licensing agreement meaningless and would amount to an emasculation of the policy underpinning the whole body of trade secret law.

Appellant's position cannot be justified by a reliance on *Sears, Compco,* and *Lear,* either. *Sears* and *Compco* did not involve the enforceability of a licensing agreement entered into between private parties negotiating at arms' length. In both *Sears* and *Compco* the issue was whether the state's unfair competition law could, consistently with the federal patent law, impose liability for or prohibit copying an article by the public. In answering the question in the negative, the court held that when an article is un-

protected by a patent or copyright, state law may not forbid others from copying that article because to forbid copying would interfere with the federal policy allowing free access to copy whatever the federal patent and copyright laws leave in the public domain (cf. *Compco Corp.* v. *Day-Brite Lighting, supra,* at p. 237 [11 L.Ed.2d at p. 672]). It hardly needs further explanation that the licensing agreement in question is binding only upon the parties to the contract and does not prohibit copying of the device by the general public. Moreover, in light of *Kewanee,* the continued validity of *Sears* and *Compco* is highly questionable. "Today's decision is at war with the philosophy of *Sears, Roebuck & Co.* v. *Stiffel Co.* 376 U.S. 225, 11 L.Ed.2d 661, 84 S.Ct. 784, and *Compco Corp.* v. *Day-Brite Lighting, Inc.* 376 U.S. 234, 11 L.Ed.2d 669, 84 S.Ct. 779." (*Kewanee Oil* v. *Bicron Corp., supra,* 416 U.S. at p. 495 [40 L.Ed.2d at p. 333], Douglas, J. dissenting.)

*Lear* is likewise distinguishable from the instant case. *Lear* dealt with a patentable idea concerning a gyroscope, a navigational device. In that case the inventor, Adkins, filed a patent application in 1954. During the pendency of the application, in 1955, Adkins entered into a licensing agreement with Lear providing for royalty payments for the use of the idea. In 1959, while the patent application was still pending, Lear terminated the contract on the ground that the invention was not patentable. In 1960 a patent was issued, whereupon Adkins brought an action claiming that Lear's failure to pay royalties constituted a breach of the 1955 contract. Lear raised the patent invalidity as a defense, contending in essence that Adkins' idea failed to fulfill the novelty requirement of the patent law (cf. 35 U.S.C. § 102).

In deciding the case, the United States Supreme Court held only that Lear was not bound to pay royalties under the agreement after 1960 if the patent was held to be invalid. However, the court was careful to point out that the same rule was not applicable to the royalties accrued between the entering of the contract and the issuance of the patent. The underlying reasoning was expressed by the court as follows: "The case before us, however, presents a far more complicated estoppel problem than the one which arises in the most common licensing context. The problem arises out of the fact that Lear obtained its license in 1955, more than four years before Adkins received his 1960 patent. Indeed, *from the very outset of the relationship, Lear obtained special access to Adkins' ideas in return for its promise to pay satisfactory compensation.*

"*Thus, during the lengthy period in which Adkins was attempting to obtain a patent, Lear gained an important benefit not generally obtained*

by the typical licensee. For until a patent issues, a potential licensee may not learn his licensor's ideas simply by requesting the information from the Patent Office. During the time the inventor is seeking patent protection, the governing federal statute requires the Patent Office to hold an inventor's patent application in confidence. If a potential licensee hopes to use the ideas contained in a secret patent application, he must deal with the inventor himself, unless the inventor chooses to publicize his ideas to the world at large. *By promising to pay Adkins royalties from the very outset* of their relationship, *Lear gained immediate access to ideas which it may well not have learned* until the Patent Office published the details of Adkins' invention in 1960. At the core of this case, then, is the difficult question whether federal patent policy bars a State from enforcing a contract regulating access to an unpatented secret idea." (*Lear, Inc.* v. *Adkins, supra,* at pp. 671-672 [23 L.Ed.2d at pp. 623-624]; italics added.) The court then declined to decide this issue and expressly left its determination to the state courts.[3]

■ We observe that, apart from the foregoing general considerations, appellant here must be estopped from asserting the unenforceability of the royalty provisions in the contract for an additional reason. The record at hand unequivocally shows that on the one hand plaintiff had no previous experience with royalty agreements, did not obtain legal advice prior to the execution of the contract, and placed full reliance on appellant's agent, Bakerich. On the other hand, the evidence reveals that Bakerich had superior knowledge in this field, sought the advice of legal counsel, and expressly represented to plaintiff that the patenting of the device was unnecessary in order to gain the contractual benefits contemplated by the parties. As a result of such representation plaintiff failed to file a patent application within the statutory time and thereby lost any possible protection that a patent would have lawfully provided for him. Thus, it is clear that due to appellant's conduct plaintiff was misled to his prejudice; and, under the doctrine of equitable estoppel, appellant is in no position to claim that the agreement in question was unenforceable for lack of a valid patent. (*Wilk* v. *Vencill* (1947) 30 Cal.2d 104, 107 [180 P.2d 351]; *Klein* v. *Farmer* (1948) 85 Cal.App.2d 545, 552 [194 P.2d 106]; 4 Witkin, Summary of Cal. Law (1960 ed.) § 94, pp. 2870-2871.)

---

[3]The pertinent portion of the opinion reads as follows: "Our decision today will, of course, require the state courts to reconsider the theoretical basis of their decisions enforcing the contractual rights of inventors. . . . Consequently, we have concluded, after much consideration, that even though an important question of federal law underlies this phase of the controversy, we should not now attempt to define in even a limited way the extent, if any, to which the States may properly act to enforce the contractual rights of inventors of unpatented secret ideas." (*Lear, Inc.* v. *Adkins, supra,* at p. 675 [23 L.Ed.2d at pp. 625-626].)

██ ██ Appellant's last contention that the judgment below is too broad and not supported by the record must be dismissed for two main reasons. First, it is well established that a point raised in the reply brief for the first time will not be considered by the court unless good reason is shown for failure to present such point before (*Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 294 [55 Cal.Rptr. 610]; *Utz* v. *Aureguy* (1952) 109 Cal.App.2d 803, 808 [241 P.2d 639]). Appellant here neglected to raise this issue in its opening brief and when it did so in its posthearing brief filed with the special permission of the court it failed to present any acceptable reason why such presentation did not take place earlier. Second, the trial court's judgment ordering royalty payments "for *all* the battery operated electronic devices for converting the brain signal known as alpha rhythm to audible form, heretofore or hereafter sold by AQUARIUS . . ." (italics added) is almost a literal citation from the provisions of the agreement and Exhibit A attached thereto. As indicated earlier, paragraph III of the agreement set out in pertinent part that "AQUARIUS agrees to pay INVENTOR a royalty of 4% of the net sales price received by AQUARIUS for *all* devices *embodying* said subject matter" (italics added). The subject matter of the agreement termed as Exhibit A consisted of "a battery operated electronic device for converting the brain signal known as alpha **rhythm to audible form for the purpose of self training of voluntary control** of the alpha rhythm" and a schematic diagram of its circuitry.

A simple reading of the foregoing authorities makes it manifestly clear that the very meaning of the trial court's judgment is that appellant is **bound to pay the agreed-upon royalties for all devices produced in the** past or to be turned out in the future as long as the devices embrace the subject matter of the agreement. By so ordering the trial court did no more than give effect to the agreement of the parties as expressed in their written instruments.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.