**CHICAGO LOCK CO., a corporation, Plaintiff-Appellee,**

v.

**Morris v. FANBERG and Victor Fanberg, co-partners, d/b/a A–Advanced Locksmith, Defendants-Appellants.**

**No. 80–5000.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 3, 1981.

Decided May 6, 1982.

Rehearing Denied July 14, 1982.

Neil F. Martin, San Diego, Cal., for Chicago Lock.

Bruno J. Verbeck, San Diego, Cal., for defendants-appellants.

H. Chester Horn, Jr., Los Angeles, Cal., for intervenor.

Before ELY and NORRIS, Circuit Judges, and PECKHAM,* District Judge.

ELY, Circuit Judge:

The Chicago Lock Company ("the Company"), a manufacturer of "tubular" locks, brought suit against Morris and Victor Fanberg, locksmiths and publishers of specialized trade books, to enjoin the unauthorized dissemination of key codes for the Company's "Ace" line of tubular locks. The District Court granted summary judgment in favor of the Fanbergs as to the Company's

---

\* The Honorable Robert F. Peckham, Chief Judge, Northern District of California, sitting by desig- nation.

federal claims of trademark infringement and unfair competition, but held trial on the common law claim of unfair competition under former Cal.Civ.Code § 3369.[1]

The court concluded that the key codes for the Company's tubular locks were improperly acquired trade secrets and enjoined distribution of the Fanbergs' compilation of those codes. For the reasons set forth in this opinion, we reverse the District Court and order that judgment be entered in favor of the Fanbergs.

## THE FACTS

Since 1933 the Chicago Lock Company, a manufacturer of various types of locks, has sold a tubular lock, marketed under the registered trademark "Ace," which provides greater security than other lock designs. Tubular Ace locks, millions of which have been sold, are frequently used on vending and bill changing machines and in other maximum security uses, such as burglar alarms. The distinctive feature of Ace locks (and the feature that apparently makes the locks attractive to institutional and large-scale commercial purchasers) is the secrecy and difficulty of reproduction associated with their keys.

The District Court found that the Company "has a fixed policy that it will only sell a duplicate key for the registered series 'Ace' lock to the owner of record of the lock and on request of a bona fide purchase order, letterhead or some other identifying means of the actual recorded lock owner." Finding of Fact No. 14, Excerpt of Record at 89. In addition, the serial number-key code correlations are maintained by the Company indefinitely and in secrecy, the Company does not sell tubular key "blanks" to locksmiths or others, and keys to Ace locks are stamped "Do Not Duplicate." See Excerpt at 86–91.

If the owner of an Ace lock loses his key, he may obtain a duplicate from the Company. Alternatively, he may have a proficient locksmith "pick" the lock, decipher the tumbler configuration, and grind a duplicate tubular key. The latter procedure is quicker than the former, though more costly. The locksmith will, to avoid the need to "pick" the lock each time a key is lost, record the key code (i.e., the tumbler configuration) along with the serial number of the customer's lock. See Excerpt at 92. Enough duplicate keys have been made by locksmiths that substantial key code data have been compiled, albeit noncommercially and on an ad hoc basis.

Appellant Victor Fanberg, the son of locksmith Morris Fanberg and a locksmith in his own right, has published a number of locksmith manuals for conventional locks. Realizing that no compilation had been made of tubular lock key codes, in 1975 Fanberg advertised in a locksmith journal, Locksmith Ledger, requesting that individual locksmiths transmit to him serial number-key code correlations in their possession in exchange for a copy of a complete compilation when finished. A number of locksmiths complied, and in late 1976 Fanberg and his father began to sell a two-volume publication of tubular lock codes, including those of Ace locks, entitled "A–Advanced Locksmith's Tubular Lock Codes." In 1976 and 1977 Fanberg advertised the manuals in the Locksmith Ledger for $49.95 and indicated that it would be supplemented as new correlations became known. See Excerpt at 95–98. About 350 manuals had been sold at the time of trial. The District Court found that Fanberg "had lost or surrendered control over persons who could purchase the books," id. at 98, meaning that nonlocksmiths could acquire the code manuals.

The books contain correlations which would allow a person equipped with a tubular key grinding machine to make duplicate keys for any listed Ace lock if the serial number of the lock was known. On some models, the serial numbers appear on the exterior of the lock face. Thus, Fanberg's manuals would make it considerably easier

---

1. Former Section 3369 was recodified virtually verbatim in 1977 as Cal.Bus. & Prof.Code §§ 17200–17203 (West). For simplicity this opinion will refer to the statute throughout as "Section 3369."

(and less expensive) for a person to obtain (legitimately or illegitimately) duplicate keys to Ace locks without going through the Company's screening process. This is what caused consternation to the Company and some of its customers. At no time did Fanberg seek, or the Company grant, permission to compile and sell the key codes. Nor did the individual locksmiths seek authorization from the Company or their customers before transmitting their key code data to Fanberg.

The Company filed a three-count complaint against the Fanbergs, alleging federal question jurisdiction and diversity of citizenship, on December 2, 1976. The complaint, see Excerpt at 1–12, was predicated on theories of trademark infringement under 15 U.S.C. §§ 1051 et seq., federal unfair competition under 15 U.S.C. §§ 1125(a), and California common law unfair competition under former Cal.Civ.Code § 3369. On November 17, 1977, Judge Enright granted summary judgment for the Fanbergs on the federal claims, but left intact the state law claim. See Excerpt at 32–34. The complaint was amended, see Excerpt at 38–46, and a four-day bench trial was held before Judge Kerr on January 23–26, 1979. On November 28, 1979, Judge Kerr entered judgment in favor of the Company and filed findings of fact and conclusions of law. See Excerpt at 75–121.

The court found that the Company's high security policy for its Ace tubular locks, of which the confidential key code data were a part, was a "valuable business or trade secret-type asset" of the Company, and that the Fanbergs' publication of their compilation of these codes so undermined the Company's policy as to constitute "common law unfair competition in the form of an unfair business practice within the meaning of Section 3369 of the Civil Code of the State of California," as broadly interpreted in *Barquis v. Merchants Collection Association*, 7 Cal.3d 94, 496 P.2d 817, 101 Cal.Rptr. 745 (1972). Excerpt at 118–120. The court

enjoined the Fanbergs from publishing or distributing any lists of key code correlations for the Company's registered series Ace tubular locks. See Excerpt at 121.

On this appeal the Fanbergs argue that the District Court erred on three grounds: (1) that the injunction against publication of their book constitutes a prior restraint prohibited by the First Amendment to the United States Constitution; (2) that the statute under which the injunction issued, former Cal.Civ.Code § 3369, is unconstitutionally vague; and (3) that the District Court applied erroneously the common law doctrine of trade secrets in concluding that the Fanbergs had committed an "unfair business practice" under Section 3369.

## THE TRADE SECRETS CLAIM

Appellants argue that the District Court erroneously concluded that they are liable under Section 3369 for acquiring appellee's trade secret through improper means. We agree, and on this basis we reverse the District Court.

■ Although the District Court's Findings of Fact and Conclusions of Law are lengthy, the thrust of its holding may be fairly summarized as follows: appellants' acquisition of appellee's serial number-key code correlations through improper means, and the subsequent publication thereof, constituted an "unfair business practice" within the meaning of Section 3369. See Excerpt at 119–20. Even though the court did not make an explicit finding that appellee's serial number-key code correlations were protectable trade secrets, both appellants and appellee premise their appeal on such an "implicit" finding. See Brief of Appellee at 13–14. We think it clear that the District Court based its decision on a theory of improper acquisition of trade secrets, and in the following discussion we assume *arguendo* that appellee's listing of serial number-key code correlations constituted a trade secret.[2]

2. Both parties devote much of their argument to whether the Company's key code data properly constitutes a "trade secret" within the

meaning of Restatement (First) of Torts § 757, comment b (1939). See Brief of Appellants at 30–33; Brief of Appellees at 13–20. Although

■ California courts have adopted the theory of trade secret protection set out in the Restatement (First) of Torts, § 757, and the comments thereto, in resolving disputes involving trade secrets. *See Sinclair v. Aquarius Electronics, Inc.*, 42 Cal.App.3d 216, 116 Cal.Rptr. 654 (1974); *Uribe v. Howie*, 19 Cal.App.3d 194, 96 Cal.Rptr. 493 (1971); *Cal Francisco Investment Corp. v. Vrionis*, 14 Cal.App.3d 318, 92 Cal.Rptr. 201 (1971). Commission of this common law tort is enjoinable under the purview of "unfair competition" and "unlawful" or "unfair business practice" under Section 3369. *See Barquis v. Merchants Collection Association*, 7 Cal.3d 94, 496 P.2d 817, 101 Cal.Rptr. 745 (1972); *Hesse v. Grossman*, 152 Cal. App.2d 536, 313 P.2d 625, 627 (1957).

The pertinent portion of Section 757 of the Restatement provides:

> One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
>
> (a) he discovered the secret by improper means, or
>
> . . . .
>
> (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means . . .
>
> . . . .

■ Trade secrets are protected, therefore, in a manner akin to private property, but only when they are disclosed or used *through improper means.* Trade secrets do not enjoy the absolute monopoly protection afforded patented processes, for example, and trade secrets will lose their character as private property when the owner divulges them or when they are discovered through proper means. "It is well recognized that a trade secret does not offer protection against discovery by fair and honest means such as by independent invention, accidental disclosure or by so-called reverse engineering, that is, starting with the known product and working backward to divine the process." *Sinclair*, 42 Cal.App.3d at 226, 116 Cal.Rptr. at 661.

■■ Thus, it is the employment of improper means to procure the trade secret, rather than mere copying or use, which is the basis of liability. Restatement (First) of Torts, § 757, comment a (1939). The Company concedes, as it must, that had the Fanbergs bought and examined a number of locks on their own, their reverse engineering (or deciphering) of the key codes and publication thereof would not have been use of "improper means." Similarly, the Fanbergs' claimed use of computer programs in generating a portion of the key code-serial number correlations here at issue must also be characterized as proper reverse engineering. Excerpt at 96, 100–01; Brief of Appellee at 29–30. The trial court found that appellants obtained the serial number-key code correlations from a "comparatively small" number of locksmiths, who *themselves* had reverse-engineered the locks of their customers. *See* Excerpt at 96–97. The narrow legal issue presented here, therefore, is whether the Fanbergs' procurement of these individual locksmiths' reverse engineering data is an "improper means" with respect to appellee Chicago Lock Company.

The concept of "improper means," as embodied in the Restatement, and as expressed by the Supreme Court, connotes the existence of a duty to the trade secret owner not to disclose the secret to others. *See* Restatement (First) of Torts, § 757, comment h (1939). "The protection accorded the trade secret holder [*i.e.*, in this case the Company] is against the disclosure or unauthorized use of the trade secret *by those to whom the secret has been confided* under the express or implied restriction of disclosure or nonuse." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) (emphasis added).

for purposes of our holding we may assume *arguendo* that the correlations do constitute a trade secret, we think it clear that because the correlations are an unpatented compilation of information, they constitute a "trade secret" within the meaning of the Restatement as adopted by California courts. *See Sinclair v. Aquarius Electronics, Inc.*, 42 Cal.App.3d 216, 222, 116 Cal.Rptr. 654, 658 (1974); Restatement (First) of Torts § 757, comment b (1939).

Thus, under Restatement § 757(c), appellants may be held liable if they intentionally procured the locksmiths to disclose the trade secrets in breach of the *locksmiths' duty to the Company of nondisclosure. See* Restatement (First) of Torts, § 757, comment h (1939). Critical to the District Court's holding, therefore, was its conclusion that the individual locksmiths, from whom the Fanbergs acquired the serial number-key code correlations, owed an implied duty to the Company not to make the disclosures. *See* Excerpt at 116.

We find untenable the basis upon which the District Court concluded that the individual locksmiths owe a duty of nondisclosure to the Company. The court predicated this implied duty upon a "chain" of duties: first, that the locksmiths are in such a fiduciary relationship with their customers as to give rise to a duty not to disclose their customers' key codes without permission, *see* Excerpt at 116; and second, that the *lock owners* are in turn under an "implied obligation [to the Company] to maintain inviolate" the serial number-key code correlations for their own locks, *see id.*

The court's former conclusion is sound enough: in their fiduciary relationship with lock owners, individual locksmiths are reposed with a confidence and trust by their customers, of which disclosure of the customers' key codes would certainly be a breach. This duty, however, could give rise only to an action by "injured" *lock owners* against the individual locksmiths, not by the Company against the locksmiths or against the Fanbergs.[3]

■ The court's latter conclusion, that lock owners owe a duty to the Company, is contrary to law and to the Company's own admissions. A lock purchaser's own re-

verse-engineering of his own lock, and subsequent publication of the serial number-key code correlation, is an example of the independent invention and reverse engineering expressly allowed by trade secret doctrine. *See Sinclair,* 42 Cal.App.3d at 226, 116 Cal.Rptr. at 661.[4] Imposing an obligation of nondisclosure on lock owners here would frustrate the intent of California courts to disallow protection to trade secrets discovered through "fair and honest means." *See id.* Further, such an implied obligation upon the lock owners in this case would, in effect, convert the Company's trade secret into a state-conferred monopoly akin to the absolute protection that a federal patent affords. Such an extension of California trade secrets law would certainly be preempted by the federal scheme of patent regulation. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

Appellants, therefore, cannot be said to have procured the individual locksmiths to breach a duty of nondisclosure they owed to the Company, for the locksmiths owed no such duty. The Company's serial number-key code correlations are not subject to protection under Restatement § 757, as adopted by the California courts, because the Company has not shown a breach of any confidence reposed by it in the Fanbergs, the locksmiths, or the lock purchasers—*i.e.,* it has failed to show the use of "improper means" by the Fanbergs required by the Restatement.

The District Court's conclusion that the Fanbergs committed an "unfair business

**3.** The Company premised its complaint on a violation of its own rights under trade secret law; the Company did not allege violations of the lock owners' rights. *Cf. Barquis v. Merchants Collection Ass'n,* 7 Cal.3d 94, 110, 101 Cal.Rptr. 745, 756 (1972) (Section 3369 permits members of the public to sue on behalf of the public generally); *Hernandez v. Atlantic Finance Co. of Los Angeles,* 105 Cal.App.3d 65, 72–73, 164 Cal.Rptr. 279, 284 (1980) (statute

authorizes suits for injunction by individuals on behalf of the general public).

**4.** If a group of lock owners, for their own convenience, together published a listing of their own key codes for use by locksmiths, the owners would not have breached any duty owed to the Company. Indeed, the Company concedes that a lock owner's reverse engineering of his own lock is not "improper means." *See* Brief of Appellee at 24.

practice" under Section 3369, therefore, must be reversed, and judgment should be entered in favor of appellants. In view of the foregoing we find it unnecessary to reach appellants' First Amendment and vagueness claims.

REVERSED AND REMANDED with instructions that judgment be entered in favor of defendants-appellants.