**SECURE SERVICES TECHNOLOGY, INCORPORATED, Plaintiff,**

v.

**TIME AND SPACE PROCESSING, INCORPORATED, Defendant.**

Civ. A. No. 89–0192–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 29, 1989.

## MEMORANDUM OPINION

ELLIS, District Judge.

This copyright and trade secret dispute arises in the singular context of facsimile machines used by the government and its contractors in the receipt and transmission of classified material. The questions presented, in general, are whether certain digital codes used by plaintiff's machines in communicating with other machines qualify for copyright or trade secret protection and, if so, whether plaintiff has taken the requisite steps to obtain and preserve that protection.

The matter came before the Court on defendant's motion for summary judgment on the copyright and trade secret claims and on plaintiff's cross-motion for summary judgment solely with respect to the trade secret claim.[1] The absence of disputed material facts rendered the matter ripe for summary disposition. For the reasons stated here, the Court entered summary judgment in favor of defendant on both the copyright and trade secret claims.[2]

### Facts

In general, facsimile machines are devices that transmit and receive printed or pictorial matter on documents from one location to another, typically over telephone lines. The facsimile devices in issue transmit the material by scanning input documents and producing a series of digital pulses electrically related to the scanned printed or pictorial images. The digital pulses are sent via wire to a receiving machine which, when synchronized with the sending machine, is able to reproduce the transmitted document.

Sally Ann Hostetler, Odin, Feldman & Pittleman, Fairfax, Va., for plaintiff.

J.T. Westermeier, Fenwick, Davis & West, Washington, D.C., for defendant.

1. The Amended Complaint originally included four counts—a common law conversion claim, a copyright violation claim and two claims for trade secret misappropriation, one under Virginia law and one under California law. Plaintiff withdrew the Virginia trade secret claim and the conversion claim, leaving for this Court's resolution the copyright claim and the claim of misappropriation of a trade secret under California law.

2. Also before the Court was defendant's motion for sanctions pursuant to Rule 11, Fed.R.Civ.P., based on plaintiff's filing of the copyright infringement claim. Although the copyright claim failed, it cannot be said that it was not "well founded in fact and ... warranted by ... a good faith argument for the extension, modification, or reversal of existing law." Rule 11, Fed.R.Civ.P. Given this, Rule 11 sanctions are unwarranted. *See Hoover Universal, Inc. v. Brockway IMCO, Inc.*, 809 F.2d 1039, 1044 (4th Cir.1987) (affirming denial of Rule 11 sanctions when party had "a [reasonable] glimmer of a chance of prevailing").

This case does not involve ordinary facsimile machines. Instead, the focus here is on so-called "TEMPEST"[3] facsimile machines, *i.e.*, machines especially equipped for the secure transmission and receipt of sensitive or classified documents. TEMPEST machines are sold to American and NATO agencies and to qualified private government contractors. Both plaintiff, Secure Services Technology, Inc. ("SST"), and defendant, Time and Space Processing, Inc. ("TSP"), manufacture and sell TEMPEST facsimile machines. SST sells these machines only to the United States government.

In May 1987, TSP decided to enter the apparently lucrative TEMPEST facsimile machine market. At that time, only three manufacturers inhabited the market—SST, Valutec and Ricoh Corporation. A fourth manufacturer, Cryptek, Inc., was poised to enter the market. Since the government had previously purchased TEMPEST machines from each of the manufacturers in the market, TSP's successful market entry depended on achieving interoperability[4] with the SST, Valutec and Ricoh machines.

Interoperability between TEMPEST machines is achieved by means of a handshake protocol.[5] This protocol, the CCITT T.30,[6] governs the content, order, and timing of the digital signals transmitted between the sending and receiving machines. The protocol covers the five phases of a document's transmission:

(a) Call set up,

(b) Pre-message procedure,

(c) Message transmission,

(d) Post-message procedure, and

(e) Call release.

Each phase serves a function in enabling TEMPEST machines to communicate with each other. The call set up is the means by which one machine establishes communication with another machine. The pre-message procedure identifies the machines to each other, establishes the capabilities of each machine, and enters commands to select specific capabilities. The message transmission phase is the actual transmission of the document. The post-message procedure includes end-of-message, confirmation, and end-of-facsimile signals. Finally, the call release phase disconnects the machines.

Within each phase, the T.30 protocol specifies the content of each binary[7] signal (*i.e.*, the exact sequence of 0's and 1's), the length of each signal (*i.e.*, the number of bytes[8]), and the order of the signals (*i.e.*, whether the machine's identification signal precedes or follows its capabilities signal). Additionally, the T.30 protocol designates strict tolerances for the length of, and the spacing between, the individual signals. These latter two parameters, taken together, define the timing of the communication link.

Adherence to the phase order and the signal parameters of the T.30 protocol is crucial for interoperability. If a facsimile machine does not "recognize" an incoming signal, it will not respond appropriately and interoperability will not be achieved. For example, non-recognition can occur if the content of a signal is wrong (*i.e.*, 11111110

3. "TEMPEST" refers to certification with the Industrial Tempest Program of the National Security Administration.

4. Interoperability, simply put, is the ability of one TEMPEST facsimile machine to send to and receive documents from another TEMPEST machine.

5. All facsimile machines communicate in accordance with handshake protocols. In fact, the title of the protocol in issue here, the CCITT T.30, is "Procedures for Document Facsimile Transmission in the General Switched Telephone Network". This indicates that all facsimile machines connected via telephone lines use this protocol.

6. CCITT is the standard abbreviation for the International Telephone and Telegraph Consultative Committee of the International Communications Union ("CCITT").

TEMPEST facsimile machines also use the CCITT T.4 protocol for the actual message transmission process. The T.4 protocol is not in issue here.

7. The facsimile machines in issue communicate via a binary coded signalling system. Binary signals are composed of a stream of zero's and one's usually transmitted in groups of eight (*e.g.*, 10101010 or 01101001).

8. Each group of eight digits is called a "byte".

is transmitted instead of 11111111). More on point, however, non-recognition will also occur if the T.30 protocol's phase order or timing parameters are not met. If an individual signal is sent out of the specified order, its transmission will not be "expected" by the receiving machine. The signal, therefore, will not be recognized, notwithstanding the fact that the binary code was correct, simply because it arrived either too early or too late. A similar effect occurs if the timing parameters are not followed. If a bit [9] is too long, for example, the receiving machine may mistake one digit for two and, by so doing, misread the content of the entire signal. The timing and order parameters, therefore, are crucial to interoperability.

For flexibility, however, the T.30 protocol does permit slight variations in specific signals. For example, the protocol may designate that a specific signal is 1010101X. The transmitting machine, in accordance with the protocol's instructions, will substitute either a one or a zero for the X and, as long as the rest of the signal is correct, the signal will be recognized. Such fill-in-the-blank variations are not only anticipated by the machines but, also, desired; they permit the facsimile machines to communicate simple information such as the designation of specific options. For more complex communications, the protocol also permits the use of signals that are entirely optional. Here too, however, these signals must be transmitted in their designated positions in the transmission sequence. To do otherwise would result in non-recognition of the optional signals because their arrival would not be expected and, thus, interoperability would be defeated.

SST took advantage of these limited opportunities to vary the content and timing of various signals within the constraints of the T.30 protocol. SST claims that these variations in timing and content, collective-

ly referred to as "protocol variations", deserve trade secret protection. And because the content variations can be transcribed into alphanumeric form, SST also claims copyright protection.[10]

TSP spent over $800,000 in an apparently successful effort to achieve interoperability with the Ricoh and Valutec machines. At that point, TSP also believed it had achieved interoperability with the SST–T1, the SST TEMPEST facsimile machine. Thereafter, in March 1988, the Air Force expressed an interest in purchasing TSP's TEMPEST machines. In this connection, government representatives requested that TSP demonstrate the interoperability of the SST and TSP machines. This demonstration was achieved through the transmission of test documents from an SST facsimile machine at a government facility to a TSP machine at TSP's plant. At that time, TSP used a protocol analyzer [11] to verify that the SST machine was following the T.30 protocol and to adjust its machine's handshake protocol to achieve interoperability with the SST machine. TSP also allegedly fixed in the memory of the protocol analyzer the digital code representing SST's handshake protocol, including the protocol variations. Even so, it appears that TSP achieved only substantial, but not complete, interoperability.

In June 1988, TSP again demonstrated its machine's interoperability with the SST machine at the Armed Forces Communication Electronics Association ("AFCEA") trade show. Here again, substantial, but not complete interoperability was achieved. Nonetheless, TSP began marketing its TEMPEST facsimile machine as interoperable with SST's TEMPEST machines. Among those who purchased the TSP facsimile machine was the Air Force Logistics Command (AFLC). In early 1989, the AFLC Special Projects Officer discovered

---

**9.** A bit is a single binary digit, *i.e.,* a single zero or one.

**10.** SST's handshake protocol is generated by a computer program apparently copyrighted by Jacob Keilsohn, who licensed the software to SST. Keilsohn and SST dispute the ownership of this software. *See Keilsohn v. Secure Servic-*

*es Technology, Inc.,* Civil Action No. 89–0608–A (E.D.Va filed Apr. 25, 1989). This dispute is not directly relevant to the case at bar.

**11.** Handshake protocol signals are transmitted at a very rapid rate. A protocol analyzer slows down the transmission so that the protocol signals can be analyzed.

that an interoperability problem still existed between the TSP and SST facsimile machines. In February 1989, he asked TSP to remedy this. To this end, TSP was loaned a government-owned SST–T1 to allow TSP to make whatever adjustments might be required to achieve complete interoperability with the SST machine. In this effort, TSP technicians again analyzed the timing of the SST machine's handshake protocol. TSP then took the SST facsimile machine to another AFCEA trade show and was now able to demonstrate complete interoperability with the SST machine. At this trade show, SST's representatives discovered, for the first time, that TSP had somehow gained possession of an SST TEMPEST facsimile machine.

SST's marketing practices are central to the resolution of this dispute. SST sells its TEMPEST facsimile machines only to government agencies. From October 1985, when sales of the SST–T1 machine began, the United States government purchased all right, title, and interest in these machine. The sales contracts contained no reservation of proprietary rights. There were no contract provisions prohibiting the government from supplying the SST facsimile machines to third parties. Moreover, neither the facsimile machine, nor the operator's manual, contained any restrictive or proprietary legends or any copyright notices. Nor did SST notify the government prior to the sale that SST claimed or might claim proprietary rights in the SST–T1 TEMPEST facsimile machine.

SST claims that it chose not to take these precautions because the government and the other TEMPEST machine manufacturers generally understood that the information contained in the handshake protocol was proprietary information. SST also claims that it took sufficient measures to ensure that its handshake protocol remained secret in its dealings with other TEMPEST machine manufacturers. And, as might well be expected of a manufacturer of TEMPEST facsimile machines, all of

SST's facilities are guarded by a complex security system. Since the inception of this dispute, SST has begun placing proprietary legends and copyright marks on all of its facsimile machines.

On February 14, 1989, this suit was filed alleging claims of trade secret misappropriation and of conversion. On May 3, 1989, SST filed a registration request for copyright protection with the United States Copyright Office. Two days later, SST amended its complaint and added a claim of copyright infringement. The Copyright Office has not, as yet, issued a copyright registration certificate to SST for its handshake protocol.

### Analysis

#### I. Trade Secret Protection

■ SST argues that its protocol variations are a trade secret entitled to protection under the California Uniform Trade Secrets Act ("the Act"). Cal.Civ.Code §§ 3426.1 to 3426.10 (West 1989).[12] In California, what constitutes a trade secret is a question of law. *Acuson Corp. v. Aloka Co.*, 209 Cal.App.3d 425, 257 Cal.Rptr. 368, 373 (6th Dist.1989); *Agricultural Labor Relations Bd. v. Richard A. Glass Co.*, 175 Cal.App.3d 703, 221 Cal.Rptr. 63 (4th Dist. 1985). Summary judgment is particularly appropriate, where, as here, the data or information claimed to be protected is not disputed.

The Act defines a trade secret in the following manner:

"Trade Secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

12. California is one of twenty four states which have adopted the Uniform Trade Secrets Act, 14 U.L.A. 369 (1989 Supp.). *See, e.g.,* Va.Code Ann. §§ 59.1–336 to 343 (Repl.Vol. 1987).

Cal.Civ.Code § 3426.1(d) (West 1989). It seems clear that SST's protocol variations satisfy the prefatory paragraph of the Act's definition. The variations fit well within the purposefully broad scope of the term "information."[13] Less clear, however, is whether the protocol variations also satisfy subsection (d)(1).[14] In any event, even assuming subsection (d)(1) is met, it is plain beyond dispute that subsection (d)(2) is not; SST failed to take reasonable steps to maintain the secrecy of the protocol variations. SST sold to the government all right, title, and interest in the SST–T1 machines. No rights were reserved. No notification was given, as required by regulation, that the SST–T1 machine included any proprietary information. *See* 48 C.F.R. § 227.473–1. No markings were placed on the machine or in the related instructional material to indicate the presence of proprietary information. *See* 48 C.F.R. § 227.473–3. Significantly, this silence on the presence of proprietary information occurred despite the purchase order's reference to 48 C.F.R. § 252.227–7013, which allows sellers of goods to the military to claim protection for proprietary information. SST, for whatever reason, failed to do so. The government, therefore acquired unlimited rights in the TEMPEST SST–T1 machines.

Precisely this situation was considered in the official comment to the Act.[15] There, it is acknowledged that "public disclosure of information through ... carelessness can preclude protection." The Uniform Trade Secrets Act § 1 comment, 14 U.L.A. 369, 373 (Supp.1989). Here, SST was careless by not properly reserving its rights to the protocol. An express statement of proprietary interest was required. 48 C.F.R. §§ 227.473–1, 252.227–7013(b). None was made prior to TSP's discovery of the information. Since SST failed to indicate in any way that it retained proprietary interest in information contained in its facsimile machine, it waived trade secret protection in the protocol variations. *See Conax Fla. Corp. v. United States,* 824 F.2d 1124, 1130–31 (D.C.Cir.1987) (in sale to government, failure to identify information for which proprietary interest was claimed constituted a waiver of the manufacturer's rights in that information).

A comparison of this case with the precautions taken by the Acuson Corporation (Acuson) in *Acuson Corp. v. Aloka Co.,* 209 Cal.App.3d 425, 257 Cal.Rptr. 368 (6th Dist.1989) is instructive. In that case, Acuson claimed trade secret protection in processes used in its ultrasonic imaging equipment, a non-invasive medical diagnostic tool. Acuson took several precautions to prevent disclosure of these imaging pro-

---

**13.** *See, e.g., American Paper & Pkg Prods., Inc. v. Kirgan,* 183 Cal.App.3d 1318, 228 Cal.Rptr. 713, 716 (2d Dist.1986) (names and addresses of customers); *People v. Gopal,* 171 Cal.App.3d 524, 217 Cal.Rptr. 487, 489–90 (1st Dist.1985) (hand drawn depictions of computer chips), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1949, 90 L.Ed.2d 359 (1986); *Sinclair v. Aquarius Elecs. Inc.,* 42 Cal.App.3d 216, 116 Cal.Rptr. 654, 658 (1st Dist. 1974) (idea for manufacture of portable brain wave monitors).

**14.** In order to satisfy subsection (d)(1), SST's protocol variations must "derive[ ] independent economic value" from not being "generally known" by its competitors. To satisfy this test's first prong, the variations must provide SST a competitive advantage. *See Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1090 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). The record is insufficiently developed on this point to permit summary judgment consideration. Worth noting, however, is that SST's success on the trade

secret claim may actually be a competitive disadvantage. If SST's trade secret hinders interoperability, purchasers seeking machines that can communicate with the other types of machines in use may be discouraged from buying the SST–T1.

Additionally, SST's protocol variations may fail the second prong of the subsection (d)(1) test. Since SST's handshake protocol follows the T.30 protocol, it is debatable whether this information was "not ... generally known". Generally known information is not protectible under the Act. *Acuson Corp. v. Aloka Co.,* 209 Cal.App.3d 425, 257 Cal.Rptr. 368, 374 (6th Dist. 1989); *Kirgan,* 228 Cal.Rptr. at 718. In any event, the Court's resolution of this case on other grounds makes consideration of these issues unnecessary.

**15.** The official comment to the Uniform Trade Secrets Act has been adopted as the California Senate Legislative Committee's Comment to California's version of the Act. Cal.Civ.Code § 3426.1 comment (West Supp.1989)

cesses: (i) the equipment was sold under a limited license for the internal software, (ii) sales persons and dealers were required to sign confidentiality agreements, and, (iii) internal padlocks were included in the equipment making it more difficult to examine the machinery. Even so, the *Acuson* court concluded that, while the precautions taken by Acuson were examples of what a manufacturer might do to prevent or inhibit others from reverse engineering[16] its product, these precautions were not adequate under the Act to provide the ultrasonic imaging equipment with trade secret protection. Notwithstanding those precautions, reverse engineering remained an effective means of discovering Acuson's ultrasonic imaging process. *Id.,* 257 Cal. Rptr. at 375–77. The Court explained that once a trade secret is disclosed to "others who are under no obligation to protect the confidentiality of the information, or [is] otherwise publicly disclose[d] ..., [the] property right is extinguished." *Id.* at 378 (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984)). The same is true here, as no precautions taken by SST precluded reverse engineering of the protocol variations; SST, through its own carelessness, failed to adequately protect its rights.

SST's reliance on a general, implied understanding with the government that the protocol variations were proprietary information, and that the government had a concomitant duty to protect them, is misplaced; SST's evidence that the government considered the protocol variations to be proprietary, rests on too slender a reed. In its memorandum, SST relies on a single government document which states that "proprietary protocols are now being used by various secure facsimile machines" and continues that the various TEMPEST facsimile machines contain "ten different, non-compatible proprietary protocols." There

is, of course, a significant difference between the government referring to handshake protocols as "proprietary protocols" in a document studying interoperability problems and recognizing that the TEMPEST facsimile machines it purchased were sold under a limitation of proprietary rights. And this is particularly true when the seller failed to inform the military that it claimed proprietary rights in the handshake protocols as required by the Federal Acquisition Regulations. *See* 48 C.F.R. § 227.473–1.

In this case, by selling its machine without reserving proprietary rights, SST effectively disclosed its protocol variations. Because the government owned all the rights to the machine, TSP's acquisition of the SST machine was entirely proper. TSP's subsequent successful reverse engineering of the protocol variations to achieve interoperability,[17] therefore, was no less proper. The Act expressly permits reverse engineering as a method of discovering what would otherwise constitute a trade secret as long as the product was not acquired by improper means. Cal.Civ.Code § 3426.1(a) (West 1989) ("[r]everse engineering ... alone shall not be considered improper means"); *Acuson Corp.,* 257 Cal.Rptr. at 379–80; *see also Kewanee Oil Co. v. Bicron Corp,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974) (construing Ohio law based on Restatement of Torts § 757(a) (1939)); *Sinclair v. Aquarius Elecs. Inc.,* 42 Cal.App.3d 216, 116 Cal. Rptr. 654, 661 (1st Dist.1974) (construing prior California law). Accordingly, the Court concludes that even assuming the protocol variations are protectible proprietary information, SST's failure to take the necessary, minimal precautions to safeguard this information when it sold the TEMPEST machines to the government

---

**16.** Reverse engineering is the process of starting with a finished product and working backwards to analyze how the product operates or how it was made.

**17.** TSP's actions in this case constitute reverse engineering in perhaps its simplest form. There is no evidence to suggest that TSP ever opened

the SST machine or examined its internal parts or software in any manner; TSP merely connected a protocol analyzer and a break out box to the SST machine and analyzed the output signal. TSP then adjusted its handshake protocol to allow its machine to communicate with the SST machine.

renders the information ineligible for trade secret protection.

## II. *Copyright Infringement*

 SST alleges that TSP violated the copyright laws by fixing the protocol variations in the protocol analyzer. To prove its claim SST must demonstrate (1) that it owns a valid copyright in the work and (2) that TSP copied the work.[18] Because the protocol variations are not subject to copyright protection, SST's claim fails the first prong of this test and summary judgment must be granted to TSP.

SST claims that its protocol variations are an original, derivative,[19] literary[20] work based upon the T.30 protocol. Federal law protects such works pursuant to 17 U.S.C. §§ 102, 103.[21] Copyright protection for derivative works was recently considered by the Fourth Circuit in *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421 (4th Cir.1986). The court, canvassing existing case law, noted that:

**18.** *See, e.g., Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 824 (11th Cir. 1982); *Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Kamar Int'l, Inc., v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir.1981); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir.1981); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir.1980).

**19.** The copyright law defines "derivative work" as: "a work based upon one or more preexisting works ... [including] any ... form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship is a "derivative work"." 17 U.S.C. § 101.

**20.** The copyright law defines literary works as: "works expressed in words, numbers or other verbal or nonnumerical symbols or indicia, regardless of the nature of the material object such as books, periodicals, manuscripts, phonorecords, film, tape, disk or cards in which they are embodied." 17 U.S.C. § 101.

**21.** 17 U.S.C. § 102 provides in pertinent part: (a) Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid

courts have said that in the copyright context the standard for originality of a compilation or derivative work is "minimal" and of a "low threshold," and is "modest at best." The requirement is satisfied if the new material or expression has what the Court in *Dan Kasoff, Inc. v. Novelty Jewelry Co.*, 309 F.2d 745, 746 (2d Cir.1962) said "was a faint trace of 'originality' " and if it provides a "distinguishable variation."

*Id.* at 438 (citations omitted). The court cited several examples of compilations and derivative works that typically qualify for copyright protection through the application of this standard, including: telephone directories,[22] a compilation of maps,[23] and flashcards containing standard mathematical equations.[24]

SST's protocol variations, however, stand on a different footing from those derivative works and compilations; the protocol variations lack even a "faint trace of originality." *Id.* At most SST can only claim copyright protection for the minor content

of a machine or device. Works of authorship include the following categories:
 (1) literary works
 ....

17 U.S.C. § 103 states in pertinent part: (a) The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.
 (b) The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.

**22.** *See, e.g., Hutchinson Tel. Co. v. Fronteer Directory Co.*, 770 F.2d 128, 132 (8th Cir.1985); *Southern Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers, Inc.*, 756 F.2d 801, 809 (11th Cir.1985); *Schroeder v. William Morrow & Co.*, 566 F.2d 3, 5 (7th Cir.1977).

**23.** *See Rockford Map Publishers, Inc. v. Directory Service Co.*, 768 F.2d 145 (7th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986).

**24.** *See Gelles–Widmer Co. v. Milton Bradley Co.*, 313 F.2d 143, 147 (7th Cir.), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963).

variations it has made in the T.30 protocol. But the form, timing, order, and content of SST's handshake protocol are dictated largely by the requirements of the T.30 protocol. As noted above, SST could, within the T.30 protocol, vary specific bits within certain signals. The T.30 protocol restraints, however, sharply limit these variations. Thus, the protocol specifies which bit to vary, what the variation means, and when the variation can occur. Likewise, any optional signals permitted by the T.30 protocol were limited to specific positions in the transmission stream. Such minor reordering or variance of binary signals does not rise to the level of copyrightable material. Even given the lenient *Andrews* originality standard, the SST protocol does not contain sufficient choice and selection to qualify for copyright protection. The opportunities for original authorship within the constraints of the protocol are too limited to merit copyright status. To grant a copyright to a mere rearrangement of binary digits would effectively eliminate any authorship or originality requirement from the copyright laws.[25]

TSP's position that SST's use of the T.30 protocol precluded any opportunity for copyrightable authorship stands unrefuted in the record. Only SST's bald, unverified assertions are to the contrary. They are insufficient to preclude summary judgment. Where, as here, a party fails to establish the existence of a material fact essential to its case, and on which the party will bear the burden of proof at trial, summary judgment is appropriate. Fed.R. Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *See also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (non-moving party must present affirmative evidence in order to defeat proper summary judgment motion); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986) (when moving party has carried its burden, non-moving party must do more than simply show that there is some metaphysical doubt as to material fact). As the plaintiff, SST bears the burden of proving, by a preponderance of the evidence, the material issue of originality. *Donald Frederick Evans & Assocs. v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986); *Broadcast Music, Inc. v. Moor-Law, Inc.*, 484 F.Supp. 357, 362 (D.Del. 1980). SST has failed to present affirmative evidence on authorship that does more than raise a mere metaphysical doubt and hence summary judgment is required. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (a genuine issue precluding summary judgment exists only if sufficient evidence is present to satisfy the appropriate substantive evidentiary standard and thus reasonably permit a jury finding for either party).

■ TSP argues that summary judgment is appropriate on a variety of other grounds. The Court need not reach these issues. In the interest of sound judicial husbandry, however, it is appropriate to address several of these alternative grounds. First, TSP argues that SST's claim must be dismissed because SST has not, as yet, received a copyright registration certificate from the Copyright Office as apparently required by 17 U.S.C. § 411.[26] TSP's argument is meritless.

---

25. SST also claims copyright protection for the timing of its implementation of the T.30 protocol. This claim, too, fails. Copyright protection for the timing of electronic binary signals is precluded by the copyright laws' exclusion of "any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. 102(b). Timing is nothing more than the process by which electronic signals are created, transmitted, received. So viewed, electronic signal timing is analogous to the size of an individual letter on a page of "Hamlet". Size of print, like a timing variation, is not copyrightable.

26. This section states, in pertinent part, that:

[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement. . . .

17 U.S.C. § 411(a).

Copyright laws make a distinction between copyright registration and receiving from the Copyright Office a certificate of registration. Under the copyright laws, copyright registration is presumed to have occurred from the moment the owner of the copyrightable material delivers his application and filing fee to the Copyright Office. 17 U.S.C. § 408(a). For this reason, it has been sensibly held by the Fifth Circuit that:

> In order to bring suit for copyright infringement, it is not necessary to prove possession of a registration certificate. One need only prove payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application.

*Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 386–87 (5th Cir.1984) (citing 2 *Nimmer on Copyright* § 7.16[B][1]); *see also Eltra Corp. v. Ringer,* 579 F.2d 294, 296 n. 4 (4th Cir.1978) (securing registration is no longer prerequisite to an infringement suit). Were the law otherwise, the owner of a copyright would be left in legal limbo while the Copyright Office considers whether he qualifies for a certificate of registration.

■ TSP also argues that the suit is premature because SST has yet to comply with 17 U.S.C. § 205 by recording in the Copyright Office the transfer to SST of Jacob Keilsohn's copyright in the handshake protocol software. This argument misconstrues SST's copyright claim. SST is not suing for violations of Keilsohn's copyrighted T.30 handshake protocol software; rather, SST sues for violations of its claimed copyright for the protocol variations. Thus, any failure to record a transfer of the Keilsohn copyright is irrelevant to SST's claim here.

■ Next, TSP argues that SST's past omission of a copyright notice from its facsimile machines bars their copyright claim. This argument is flatly contradicted by the plain language of 17 U.S.C. § 405(a). The statute provides that the omission of the copyright notice does not invalidate the copyright in a work if "registration ... is made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered...." SST did not begin marketing its SST–T1 facsimile machine until 1985. Since SST now includes copyright markings on all of its facsimile machines, section 405(a), by its terms, refutes TSP's argument.

■ TSP further argues that the first sale doctrine bars SST's suit because the government, as the first purchaser, disposed of SST's facsimile machine by loaning it to TSP. The first sale doctrine allows the purchaser of a copyrighted product to dispose of the product as he wishes. 17 U.S.C. § 109(a). But this doctrine does not permit the first purchaser to allow others to make copies of the copyrighted material. For example, a purchaser may lend a copy of a book to his neighbor, but the neighbor cannot photocopy the book. *See Red Baron–Franklin Park, Inc. v. Taito Corp.,* 883 F.2d 275, 279–80 (4th Cir.1989); *Mirage Editions, Inc. v. Albuquerque A.R.T., Co.,* 856 F.2d 1341, 1344 (9th Cir. 1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989). SST alleges that what occurred was, in fact, improper reproduction of their protocol variations. The first sale doctrine, therefore, is inapplicable here.

■ TSP claims there was no "fixation" of SST's protocol variations as required by 17 U.S.C. § 102. But, as the Third Circuit noted in *Williams Elecs., Inc. v. Artic Int'l, Inc.,* 685 F.2d 870, 877 (3d Cir.1982), fixation includes fixing a copy of the copyrighted material into a computer memory. That is precisely what SST alleges occurred here. Specifically, SST claims that TSP fixed the protocol variations in the memory of the protocol analyzer when TSP analyzed the SST–T1's protocol. But TSP contends that SST's protocol was not fixed in the protocol analyzer for a period greater than the "transitory duration" as required by law. *See* 17 U.S.C. § 101. It appears, therefore, that the fixation issue is a dis-

puted issue of fact not amenable to summary disposition on the current record.[27]

 Next, TSP claims that 48 C.F.R. § 252.227–7013, while ambiguous, should be construed to waive copyright protection for copies made for government use. 48 C.F.R. § 252.227–7013(e)(1). Even assuming, *arguendo*, that TSP correctly construed this regulation, it would not operate to waive copyright protection where, as here, a private party allegedly copied a government item for its own gain. Nor can TSP rely on 17 U.S.C. § 117 to dispose of the copyright claim. Section 117 allows the owner of a copyright to use the copyrighted work in conjunction with computer systems as the owner sees fit. But SST, not TSP, was the owner of the alleged copyright.

 Finally, TSP asserts that this case was brought in the wrong forum. Relying on 28 U.S.C. § 1498(b),[28] it asserts that the copyright claim should be brought in the Court of Claims. But as the District of Columbia Circuit noted in *Auerbach v. Sverdrup Corp.*, 829 F.2d 175 (D.C.Cir. 1987), *cert. denied, sub nom. Terminal Realty Penn Co. v. Auerbach*, 485 U.S. 905, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988). Section 1498(b) applies only when the government expressly authorizes or consents to the copyright infringement. *Id.* at 180–81. When, as here, the government was only an innocent facilitator of the copyright infringement, section 1498(b) is inapplicable.

But the flaws in TSP's other arguments do not change the Court's conclusion that SST's handshake protocols do not deserve copyright protection because they lack the requisite authorship and originality. On the contrary, the Court is persuaded that SST's remedy, if any, to protect its protocol variations was through the trade secret protections afforded by California. Summary judgment on the copyright claim is, therefore, appropriate.

An appropriate order has been entered.

---

**27.** It is worth noting that the undisputed record indicates TSP had no need to fix or copy the content of the protocol variations. The record is devoid of any evidence that TSP attempted to decipher the SST–T1 protocol's binary code. To the contrary, the undisputed record reflects that TSP's engineers were uninterested in the content of the SST machine's protocol; they did not need to decipher the content of the protocol variations to achieve interoperability; all TSP needed was verification that the SST–T1 used the T.30 protocol so that it could match the precise timing used by the SST machine.

**28.** This section states, in pertinent part, that:

Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm or corporation acting for the Government and with the authorization or consent of the Government, the exclusive remedy of the owner of such copyright shall be by action against the United States in the Claims Court....

28 U.S.C. § 1498(b).