**ALLEN–MYLAND, INC.**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civ. A. No. 85–6166.

United States District Court, E.D. Pennsylvania.

Aug. 1, 1991.

Robert G. Levy, and Frank, Bernstein, Conaway and Goldman, Baltimore, Md., for Allen–Myland, Inc.

Evan R. Chesler, Cravath, Swaine & Moore, New York City, for Intern. Business Machines Corp.

## MEMORANDUM

O'NEILL, District Judge.

## I. INTRODUCTION

Allen–Myland ("AMI") moves for limited reconsideration of my decision in *Allen–Myland, Inc. v. International Business Machines Corp.*, 746 F.Supp. 520 (E.D.Pa. 1990) ("*AMI v. IBM* II") in light of the Supreme Court's recent decision in *Feist Publications, Inc. v. Rural Telephone Service Co.*, — U.S. —, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In *AMI v. IBM* II, I held in part that AMI was liable for infringing IBM's copyright in its 3090 microcode. In arriving at this conclusion, I did not reach AMI's argument that tape 2 of the 3090 microcode tapes supplied by IBM was not sufficiently original to be copyrightable because I found that the originality of the contents of tape 2 should not be analyzed in isolation from the rest of the 3090 microcode. 746 F.Supp. at 531, 532 n. 7.

AMI moves for reconsideration on two grounds. First, AMI argues that the *Feist* decision requires that I analyze the originality of tape 2 alone. AMI Motion for Limited Reconsideration in View of Supreme Court's Decision in *Feist* at 7. AMI then argues that the *Feist* directive for assessment of the originality of factual compilations applies to this case and that when that standard is applied, tape 2 lacks the creativity necessary to qualify for copyright protection. AMI Motion at 9, 11–14, 18–20. Although I am not persuaded that *Feist* requires me to do so, I will determine the originality of tape 2 in isolation from the rest of the 3090 microcode.

## II. DISCUSSION

A. *Tape 2 should not be analyzed in isolation from the rest of 3090 microcode*

■ As I noted in *AMI v. IBM* II, AMI concedes that the 3090 microcode contains valid, copyrightable material. 746 F.Supp. at 531. AMI's contention that the copyrightability of tape 2 should be analyzed separately from the rest of the 3090 microcode is premised on the *Feist* Court's holding that copyright protection of a whole work does not extend automatically to each constituent element of the work. In *Feist*, the Court explained the significance of originality to copyright:

> The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author.

*Feist*, 111 S.Ct. at 1289.

The Court reasoned that although the phone directory "considered as a whole, is subject to a valid copyright because it contains some foreward text, as well as original material in its yellow pages advertisements," *Feist*, 111 S.Ct. at 1296, the copyright in the directory as a whole did not protect the parts of the directory which were not themselves original. *Id.* at 1289. The Court then examined the originality of the white pages independently of any origi-

nality in the copyrighted work as a whole. In fact, Justice O'Connor articulated the issue presented by the case as the "clarif[ication of] the extent of copyright protection available to telephone directory white pages." *Feist*, 111 S.Ct. at 1286.

In *Feist*, the Court was concerned with a publication which divides naturally into separate constituent sections: the introduction, the white pages and the yellow pages of the telephone book. Justice O'Connor described the phone book as "a typical telephone directory, consisting of white pages and yellow pages." *Id.* at 1286. The foreward, white and yellow pages are used separately and without reference to one another. They are freestanding works; indeed, white and yellow pages are often published in separate volumes.

By contrast, I held in *AMI v. IBM* II that tape 2 was "a substantial, necessary portion of a single work, the 3090 microcode." 746 F.Supp. at 531–32. Thus, I found that while it is stored on separate tapes the 3090 microcode is a single work. *Id.* at 531. I found that the 3090 microcode could have functioned properly had IBM chosen to store the contents of tape 2 together with the information on the other tapes. *Id.* Further, I found that where the information had been stored was not relevant in actual use: "when the 3090 microcode loads into the memory of the 3092 for execution, its arrangement bears no relationship to its segregation for archival purposes in tapes 1 through 5, so that the contents of tape 2 are scattered and intermingled with the rest of the 3090 microcode during the 3090 system's operation." *Id.* at 531. Unlike the white pages relative to the rest of the phone directory in *Feist*, the contents of tape 2 are not a discrete element which is simply a part of a whole

work. Rather, the contents of tape 2 are the "instructions, software tools and data used in conjunction with or by the remainder of the 3090 microcode stored by IBM on tapes 1, 3, 4 and 5." *Id.* The relationship of the white pages to the other parts of the phone directory, which can be used separately, is unlike the dynamic relationship of tape 2 to the rest of the 3090 microcode.[1] As I found in *AMI v. IBM* II, "[t]he 3090 microcode and the 3090 system cannot function properly without the tables, instructions and data stored on tape 2." *Id.*

AMI admits that the contents of tape 2 work in conjunction with the other parts of the 3090 microcode to direct the functions of the system. AMI concedes that "each directive" on tape 2 is a "fragment to be used to fill in a *blank* in a program" and that "[t]he program (all except for the fragments listed on tape 2) resides on Tapes 1, 3, 4, and/or 5." AMI Reply Memorandum at 13.

The *Feist* decision does not alter my conclusion that the originality of 3090 microcode should be considered as a whole work. The microcode was created through a single research effort and the information stored on the different tapes is designed to work together.[2] Moreover, the *Feist* Court did not disapprove specifically of decisions requiring that the originality of a work be evaluated as a whole. *See e.g., M. Kramer Mfg., Co. v. Andrews*, 783 F.2d 421, 439 (4th Cir.1986) ("in reviewing a derivative work for originality, it is not sufficient to consider the matter by looking at the component parts: the work must be reviewed as a whole, not just reviewed or analyzed part by part") (cited in *AMI v. IBM* II, 746 F.Supp. at 531); *Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F.Supp. 37, 67 (D.Mass.1990) ("To determine copyright-

1. For the limited purpose of understanding the dynamic relationship between tape 2 and the rest of the 3090 microcode, a helpful if overly simplistic analogy is to the index of a book where the hypothetical user has a constant need to look up the references to the main text.

2. Citing the testimony of its expert Mr. Belgard, AMI asserts that the tape 2 portion was written after the rest of the 3090 microcode had been completed,. AMI Memorandum at 14 and n. 6

(citing Belgard, Tr. at 1418–19). Mr. Belgard was not involved in the development of the 3090 microcode. The manager of the IBM microcode development program specifically contradicted Mr. Belgard's assertion. Hogan, Tr. at 1557–58. As the manager of the research team is better situated to characterize the nature of the development effort, I credit the testimony of IBM's witness.

ability, a court need not—and, indeed, should not—dissect every element of the allegedly protected work. Rather, the court need only identify those elements that are copyrightable, and then determine whether those elements, *considered as a whole*, have been impermissibly copied.") (emphasis in original); *Atari Games Corp. v. Oman*, 888 F.2d 878, 882–83 (D.C.Cir. 1989) (rejecting "component-by-component analysis," and instead ruling that focus must ultimately be on "work as a whole"); *see also Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 (9th Cir. 1970) (greeting cards held to be original and copyrightable although textual matter standing alone was not copyrightable; "all elements of each card, including text, art work, and association between art work and text, [must] be considered as a whole").

I remain persuaded that the 3090 microcode is an integrated work, some of which is stored on tape 2. IBM's decision to store information on tape 2 does not thereby render the contents of tape 2 a discrete element of a whole akin to the white pages relative to a whole phone directory. Nevertheless, because the *Feist* Court did not limit to factual compilations the general rule it was purporting to lay down and did not specifically approve or disapprove of decisions in which courts compelled the examination of a work as a whole, I will consider the originality of tape 2 separately from the rest of the 3090 microcode.

B. *Tape 2 should not be analyzed under the Feist standard, which applies to compilations of pre-existing facts*

▇ In its motion for reconsideration, AMI argues for the first time that tape 2 represents a compilation of factual material. AMI Motion at 9 (data files); 18 (instruction files); 19 (software tools). I find, however, that tape 2 is not merely a compilation of factual material. If *Feist* requires me to assess the originality of tape 2 independently of the rest of the 3090 micro-

code, I am not limited to looking for originality in the arrangement of facts, the inquiry appropriate for factual compilations, because unlike the white pages tape 2 is not a compilation of facts. I will summarize first the Court's holding in *Feist* and then explain why the contents of tape 2 should not be evaluated as a collection of pre-existing facts.

The *Feist* decision addresses the extent to which copyright protection should be extended to a "compilation," defined in 17 U.S.C. § 101 as:

a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resultant work as a whole constitutes an original work of authorship.

17 U.S.C. § 101 (1977). The Copyright Act limits the scope of protection for compilations:

The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.

17 U.S.C. § 103(b).[3]

In *Feist*, the Supreme Court affirmed basic principles of copyright law. "To qualify for copyright protection, a work must be original to the author." *Feist*, 111 S.Ct. at 1287. Facts, that is information which is "part of the public domain available to every person," *id.* at 1289, are not copyrightable because "facts do not owe their origin to an act of authorship." *Id.* at 1288. A factual compilation is copyrightable "if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves." *Id.* at 1290.

The Supreme Court held that the individual entries copied in *Feist* (names, towns and telephone numbers from a white pages

---

**3.** Since it admits to having copied the whole of tape 2, AMI does not contend that it copied

"preexisting material" only. AMI Motion at 4.

listings) were not copyrightable because "they existed before Rural [the copyright owner] reported them" and that information did "not owe its origin to Rural." 111 S.Ct. at 1296 (internal quotes omitted); *see Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 548, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) (permitting copying of constituent elements that are not original, e.g., "quotations borrowed under the rubric of fair use from other copyrighted works, facts, or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions"). The *Feist* Court treated the entries as facts and the white pages as a compilation which could be protected by copyright only if the arrangement of facts was original.

Unlike the rival phone company in *Feist,* AMI did not copy a collection of facts as defined by the *Feist* Court. I held in *AMI v. IBM* II that tape 2 contained "instructions, software tools and data," 746 F.Supp. at 531, all of which was created by IBM. This information did not exist before IBM programmers created it; all of the information on tape 2 "owe[s] its origin" to IBM. *Feist,* 111 S.Ct. at 1296 (internal quotes omitted). Unlike the entries in the white pages in *Feist,* the information arranged on tape 2 was not "part of the public domain available to every person," *id.* at 1289, and IBM did not "merely discover[ ] [the] existence" of this information. *Id.* at 1288. Rather, IBM created it.

Nor did the information contained on tape 2 "preexist" the creation of tape 2. IBM created all of the 3090 microcode in a single effort, *see supra* n. 1, and not as AMI contends, in a sequence terminating with the mechanical construction of the tables, some of which are contained on tape 2. AMI Motion at 14 and n. 6. I do not accept AMI's central contention that the entirety of tape 2 is merely a factual compilation and I note again that AMI did not make this argument prior to its motion for reconsideration.

While I do not use the same method for measuring originality of most of the contents of tape 2 that I would were tape 2 a factual compilation, I do use the same standard for originality articulated in *Feist* because the Court reaffirmed basic copyright law on the meaning of that term. "As a constitutional matter, copyright protects only those constituent elements of a work that possess more than a *de minimis* quantum of creativity." *Feist,* 111 S.Ct. at 1297; *see* AMI Motion at 9–10 (to be original, tape 2 need only have a "minimal degree of creativity"); *Atari Games Corp. v. Oman,* 888 F.2d 878, 882 (creativity threshold is met by " 'some modest amount of intellectual labor' ") (quoting *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 668 n. 6 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Evidence of originality may be found anywhere on tape 2 rather than only in "the manner in which the collected facts have been selected, coordinated, and arranged." *Feist,* 111 S.Ct. at 1294.

C. *Analyzed separately, tape 2 is sufficiently original to merit copyright protection*

■ 1. Every time AMI copied any of the 3090 microcode, it copied at least tape 2. Guadagno, Tr. at 352. Therefore, if I conclude that any portion of tape 2 is original, my finding that AMI is liable for copyright infringement is unchanged. AMI concedes this point by expressing IBM's burden as the following: "To prove originality, therefore, IBM had the burden of demonstrating at trial that *at least some part of Tape 2* is material that was independently written by IBM, and that such material possess some minimal degree of creativity." AMI Motion at 8. (emphasis added); *see* AMI Motion at 7 ("Because Tape 2 is only a part of the material that was registered with the Copyright Office as a unitary work (i.e., the entire five tapes of the 3090 microcode), *Feist* requires an inquiry, based on the record created at trial, as to whether *any* of these 'instructions, software tools and data' were 'original' and, therefore, protectible in and of themselves.") (emphasis added); AMI Motion at 23 ("If the court ... concludes that *none* of the files of Tape 2 has been proven

to be copyrightable expression, then it should find AMI not liable ...") (emphasis added).[4]

2. Tape 2 consists of 15 files.[5] As a basis for discussion of their originality, I will briefly review the evidence introduced at trial pertaining to four of them, called Instruction Files: the FRU Table Update file, Initialization Table, Interrupt Table and Power On Table.[6]

### a. FRU Table Update File

IBM introduced testimony by its expert, Professor Bernard Galler, on whose testimony I relied in my earlier decision, that each of the lines in the FRU Table Update File is a computer program instruction. Galler, Tr. 1662. I credit Professor Galler's testimony that the file is a series of computer program instructions directing the creation of the FRU Table; that is, the file is not a parts list, as AMI's expert Mr. Belgard testified, but a program that creates a list. Galler, Tr. at 1660–63; Belgard, Tr. at 1368.

### b. Initialization Table

The Initialization Table on tape 2 is used during the power on sequence to test various sensors, to set limits of temperature and voltage and to monitor the subsequent operation of the computer. Galler, Tr. at 1642. It is also used to set certain default values in the system. *Id.* Professor Galler testified that each line in the initialization table was a program instruction. Galler, Tr. at 1642–44, 1648, 1663. To illustrate, he explained how a sample line from the Initialization Table works in conjunction with code shipped on Tape 1. Each line in the Initialization Tables begins with a two-digit "command" specifying a particular action to be taken by the program, such as "read" or "write register." Galler, Tr. at 1641–42; 1643–44, 1648; IBM Proposed Findings of Fact ¶ 331. Each line of code in the Initialization Table contains a piece of data coordinated with a command that determines how the data is to be used. Galler, Tr. at 1647–49; IPF ¶ 331. He explained that the program reads each instruction in the Initialization Table, executes various branches to complete whatever operation the program has been instructed to do by the instruction tables and then returns to the Initialization Table for the next instruction in sequence. Galler, Tr. at 1641–50; IPF ¶ 331. Professor Galler explained that the process of reading each instruction is an example of a table-driven computer program. Galler, Tr. at 1650.

### c. Interrupt Table

IBM introduced evidence that each of the lines that make up the Interrupt Table is a computer program instruction. Galler, Tr. at 1656. Professor Galler explained that the program, including the portion contained in the Interrupt Table, instructs the computer to take appropriate actions when there is an interrupt within the system (usually a sign of trouble) by deciding whether there is trouble, how serious it is, how urgent it is and what to do about it. Galler, Tr. at 1651. Each line in the Interrupt Table contains an "interrupt type" which determines what kind of action is going to be taken. Galler, Tr. at 1651–52.

---

**4.** I note that AMI's position that none of the contents of tape 2 are original appears to contradict its earlier proposed finding that "portions" of tape 2 were not original: "Portions of Tape 2 are parts lists that correspond to parts used in the machine or are isolated statements that are not of themselves creative or original works of authorship." AMI's Supplemental Proposed Findings of Fact and Conclusions of Law, 168.8 at 4.

**5.** The other eleven files are: Data files (Pristine MCT, Header, Symbol Table, SEC Number); Software tools (Merge Mask, S0 Merge Mask, S1 Merge Mask, Features Mask, MATXREF, Virtual Disk) and BFYDL Text. AMI Motion at 8. The discussion of choices made by the IBM 3090 microcode development team applies to the entire contents of tape 2 and may be considered evidence of the originality of all of tape 2 not just the instruction files.

**6.** AMI's expert, Mr. Belgard, testified that tape 2 contained "configuration data" and that "[t]here are no programs on tape 2." Belgard, Tr. at 1365. To the extent that Mr. Belgard's characterization of the contents of tape 2 differs from that of Professor Galler, for the reasons articulated below, I credit Professor Galler's testimony.

### d. Power On Table

IBM introduced evidence that each line of the Power on Table is a computer program instruction which is interpreted by other parts of the 3090 microcode program. Galler, Tr. at 1663–64. IBM introduced a typical line from the Power On Table which was an instruction to the computer to place data contained in the instruction line at a particular address in memory. Galler, Tr. at 1663.

3. AMI's approach to originality as to each of the files of tape 2, including the instruction tables, is affected by its view that most are simply compilations of factual information. AMI Motion at 18–19 (Data, instruction & software tool files). Under *Feist,* a court may find originality in factual compilations only when the copyright owner "selected, coordinated or arranged [the] uncopyrightable facts" in an original way. *Feist,* 111 S.Ct. at 1296. AMI attempts to fit the tables into the *Feist* mold by describing the format within each entry of each of the instruction files as "a simple command, an address of a location within the memory of the 3090 system and a data field, in that order—what would appear to be an obvious progression." AMI Memo at 11. As I do not find that any of the instruction tables are mere compilations of facts, my inquiry need not be limited to originality in the arrangement.[7]

In *AMI v. IBM* II, I explained the standard by which the copyrightability of tape 2 should be measured:

> 17 U.S.C. § 101 defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." As the Court of Appeals for the Third Circuit stated in *Apple*

*Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1249 (3rd Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984), "a computer program, whether in object code or source code, is a 'literary work' and is protected from unauthorized copying" under 17 U.S.C. § 102(a) if it is an original work of authorship fixed in a tangible medium of expression.

*AMI v. IBM,* 746 F.Supp. at 531.[8] *See also Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222 (3d Cir. 1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) (copyright in computer program extends beyond literal codes to protect structure, sequence and organization).

In *Feist,* the Supreme Court defined "original": "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." 111 S.Ct. at 1287 (citing 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990)); *see also* 1 Nimmer, § 2.01[A] (originality means that the work owes its origin to the author). The Court emphasized that the requisite level of creativity is "extremely low" and that the "vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Feist,* 111 S.Ct. at 1287 (quoting 1 Nimmer, § 1.08[C][1] ).

The evidence presented by IBM is sufficient to support a finding that at least the instruction files are original expression. I note again that the evidence of choices made by the IBM 3090 microcode development team applies to the other files on tape

---

**7.** IBM disputes AMI's characterization of the contents of tape 2 as arrangements of facts for all of the files herein except the data files. IBM Response at 14.

**8.** AMI uses a dictionary definition of programming to argue that none of the contents of tape 2 can be considered to be computer programming because the tables of instructions are not "a complete series" but "each directive appears to be a mere fragment". AMI Reply at 12–13. Although the statutory definition defines a program as "a set ... of instructions," nothing in this definition compels the conclusion that the program label attaches to the instructions only as a complete set. 17 U.S.C. § 101. In fact, AMI concedes that the instructions stored on tape 2 are "fragments" of the program. AMI Reply at 13.

2 and may be considered evidence of their originality as well. *See supra*, n. 5.

AMI does not dispute that the contents of tape 2 "owe[ ] [their] origin" to IBM. *Feist*, 111 S.Ct. at 1296; *see* AMI Reply Memorandum at 8.[9] AMI contends that the contents of tape 2 lack originality in part because tape 2 allegedly was created after the rest of the 3090 microcode and its contents consequently were dictated by the programming choices IBM had already made. AMI Motion at 14 and n. 6. The only basis in the record for this assertion is testimony I have said I will not credit. *See supra*, n. 2 and Section II B. The manager of the IBM research team which created the 3090 microcode testified that it "was not developed or designed in pieces" but as "one design activity altogether." Hogan, Tr. at 1557–58.

In considering the copyrightability of the 3090 microcode as a whole, I made the following findings in my earlier decision:

> The evidence establishes that to perform the various processor controller functions and to enable the 3090 system to run IBM could have written the 3090 microcode in a number of ways other than the particular mode of expression it ultimately selected. Hogan, Tr. at 164; Belgard, Tr. at 1383, 1405–1410, 1420. For example, IBM: did not have to write the 3090 microcode as a table-driven program; could have chosen to put different portions of the 3090 microcode in the form of a table; could have used an operating system other than the VM in the 3090 microcode; or could have written the 3090 microcode in a programming language other than PL/S. Hogan, Tr.

at 110–112, 147, 161–162; Galler, Tr. at 1671; Allen, Tr. at 1175–1176.

*AMI v. IBM* II, 746 F.Supp. at 532–33.

Although I made the findings quoted above with respect to the 3090 microcode as a whole, I believe the evidence of choices that IBM made supports a finding of the originality of the contents of tape 2 as well. As I noted in my earlier decision, IBM did not have to write the 3090 microcode as a table-driven program. *AMI v. IBM* II, 746 F.Supp. at 532. While IBM chose to segregate information used repeatedly by the program into tables stored partly on tape 2, that information could have been represented in ordinary lines of code. *Id.* and n. 9. In addition, IBM could have used fewer or more or different tables. Hogan, Tr. at 147.[10] Professor Galler explained the variety of choices included the decision to have tables at all:

> You can either have more complicated code and simpler tables, or you can have much more complicated tables and simplify the code. You have choices, many choices in programming. This is one of them, whether to have a table and how much of the algorithm to put into the table.

Galler, Tr. at 1639; Hogan, Tr. at 1561. Professor Galler explained that each choice that was made was informed by balancing the "gains and losses" with respect to flexibility and efficiency. Galler, Tr. at 1637–38.

The content of the tables also was the result of choices made among different options. In fact, after IBM made its original choices to order and structure the tables, it reordered the tables to improve them in later versions of the program. Hogan, Tr. 1562–63. AMI concedes that IBM present-

**9.** AMI claims that because the copyright holder in *Feist* assigned the telephone numbers, IBM cannot distinguish *Feist* on the basis that IBM was the source of the contents on tape 2. AMI Reply at 8. I disagree. The telephone company was not the source of all of the information in the white pages listings. The telephone company "may have been the first to discover and report the *names, towns,* and telephone numbers of its subscribers, but this data does not 'ow[e] its origin'" to the company. *Feist*, 111 S.Ct. at 1296 (citation omitted) (emphasis add-

ed). The *Feist* Court held that the information "existed before Rural reported them and would have continued to exist if Rural had never published a telephone directory." *Id.*

**10.** AMI's witness Mr. Allen conceded that IBM could have elected to write the 3090 microcode with instructions and the data on which the instructions operate arranged contiguously, instead of segregating some of the information in tables. Allen, Tr. at 1175–76.

ed evidence both that the entries could have been arranged differently within some of the tables and that information within entries could have been arranged differently. AMI Motion at 10. Professor Galler testified that "there are many ways" in which the information contained in the files could have been presented differently. Galler, Tr. at 1672. He testified that the 3090 microcode, including the tables or files on tape 2, represented "an excellent methodology and organization" and that the "design that went into these tables and the software that accompanied them, in terms of the organization, the sequencing, the general way of expressing information ... is absolutely great." Galler, Tr. at 1675–76.

AMI contends that evidence of choices made by IBM among different forms of expression does not support a finding of originality in the expression finally selected. I disagree. I believe that IBM's choices as to whether and how to use a table structure, how to arrange the instructions and other information within the tables and within the entries in the tables were all evidence of intellectual labor supporting a finding that the tables are "protected ... 'fruits of intellectual labor.'" *Feist,* 111 S.Ct. at 1288 (quoting *The Trademark Cases,* 100 U.S. 82, 94, 25 L.Ed. 550 (1879)); *see also Whelan Associates,* 797 F.2d at 1240 (idea and expression do not merge when "there are a variety of program structures through which that idea can be expressed"); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714

F.2d 1240, 1253 (3d Cir.1983) (same) (quoted in *AMI v. IBM* II, 746 F.Supp. at 532).[11]

AMI cites *Secure Services Technology, Inc. v. Time & Space Processing, Inc.,* 722 F.Supp. 1354 (E.D.Va.1989) in support of its view that IBM's choices among alternative forms of expression do not support a finding of originality. In *Secure,* the Court denied a company's claim of copyright protection for the variations in facsimile transmission signals the company made to another's facsimile machine communication system. 722 F.Supp. at 1362–63. The Court denied copyright protection to the derivative work because the facsimile system could tolerate only "slight variations," *id.* at 1358, and the "form, timing, order, and content" of the variations were "dictated largely by the requirements" of the preexisting system. *Id.* at 1363.

AMI's reliance on *Secure* is misplaced. In its Motion for Reconsideration, AMI does not contend that tape 2 is derivative of another work. With respect to *Secure,* the proper comparison with tape 2 is not the "minor reordering" performed by the company that sought copyright protection, *Secure,* 722 F.Supp. at 1363, but the system that predated the variations made by the company. Further, the Court's holding in *Secure* supports the view that IBM's choices constitute evidence of originality: "Even given the lenient *Andrews* originality standard, the [variation] does not contain sufficient choice and selection to qualify for copyright protection." *Id.* at 1363 (citing *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 438 (4th Cir.1986)).[12]

**11.** In addition, while it is true that in *Feist* the Supreme Court squarely rejected the view that copyright protection could be awarded on the basis of effort rather than originality (the discredited "sweat of the brow" theory), that holding does not render effort utterly irrelevant. *Feist,* 111 S.Ct. at 1291–95. In this case, the evidence IBM submitted of the quantity of effort—about 1,500 person years—required to develop the 3090 microcode, including the contents of tape 2, is probative also of the creative nature of that effort. Hogan, Tr. at 1559.

**12.** To show the availability of choices, IBM also cites the example of two of the data files, the Symbol Table and the Pristine MCT. Each use the "different expressions" of English words and

abbreviations and numeric codes to portray the same information. Galler, Tr. at 1671–73. AMI claims that this choice should not be copyrightable. AMI Reply Memorandum at 18 (citing *Signo Trading International Ltd. v. Gordon,* 535 F.Supp. 362, 364 (N.D.Cal.1981) (translation and transliteration of short phrases from English to Arabic is incapable of nuance and therefore lacks originality). Unlike the plaintiff in *Signo,* whose claim for copyright protection was based on the English/Arabic distinction alone, IBM's argument that the choices it made show originality does not rest on this sole example, which should be considered in conjunction with evidence of the other choices made by IBM.

AMI contends that IBM's decision to create a table-driven program is not evidence of original expression in the tables stored on tape 2. AMI Reply Memorandum at 20. AMI illustrates its argument with the following hypothetical: 1) suppose IBM did not use tables; 2) and instead placed the information from tape 2 among the rest of the microcode; 3) and that someone copied the information from the microcode to create his own table; 4) then that act of copying would not infringe IBM's copyright. *Id.*

What AMI actually did differs from AMI's hypothetical in two respects. AMI copied not only information but the arrangement of that information. Secondly, the information AMI copied "ow[ed] its origin" to IBM. *Feist,* 111 S.Ct. at 1296 (citation omitted). The two decisions AMI relies on are inapposite as each concerns copying of uncopyrightable facts. *See Gem Products, Inc. v. Robertshaw Controls Co.,* 229 U.S.P.Q. 740, 743 (C.D.Cal. 1986); *Financial Information, Inc. v. Moody's Investors Serv., Inc.,* 808 F.2d 204, 207 (2d Cir.1986), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). In fact, *Moody's Investors* supports a finding of originality when there is evidence that the copyright holder "exercised selection, creativity and judgment" such as IBM's choices to have tables and to structure them in particular ways. *Moody's Investors,* 808 F.2d at 207.

AMI contends that the command terms IBM used in the instruction files are "succinct and functional" and therefore that I should conclude that they are uncopyrightable because the idea and its expression are merged. AMI Memo at 15–16. In *AMI v. IBM* II, I explained that the idea/expression distinction prohibits monopolization of an idea through copyright protections where there is only one or a limited number of ways to express the idea. 746 F.Supp. at 532 (citing *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879); *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954)). I referred also to discussion by the Court of Appeals for the Third Circuit:

[the inquiry should] focus on whether the idea is capable of various modes of expression. If other programs can be written or created which perform the same function as an Apple's operating system program, then that program is an expression of the idea and hence copyrightable. In essence, this inquiry is no different than that made to determine whether the expression and idea have merged, which has been stated to occur where there are no or few other ways of expressing a particular idea.

746 F.Supp. at 532 (quoting *Apple Computer,* 714 F.2d at 1253).

AMI cites *Lotus Development* in support of its contention that a short computer program command merges with its expression. AMI Memo at 16 n. 7 (citing 740 F.Supp. at 67). I do not read the *Lotus Development* decision as supporting AMI's view that merger is dispositive of the issue of copyrightability. The Court held that:

The fact that some of these specific command terms are quite obvious or merge with the idea of such a particular command term does not preclude copyrightability for the command structure taken as a whole. If particular characteristics not distinctive individually have been brought together in a way that makes the 'whole' a distinctive expression of an idea—one of many possible ways of expressing it—then the 'whole' may be copyrightable.

740 F.Supp. at 67.

IBM introduced evidence that there were "many ways" that the information on each of the files could have been portrayed differently. Galler, Tr. at 1672. Regarding the command terms specifically, Professor Galler testified that IBM could have chosen to use different verbs. *Id.* AMI offered no evidence to rebut this specific testimony. Although IBM did not elicit additional testimony to support the view that the command terms do not merge with their expression, based on the evidence above, I cannot hold that the terms do merge.

D. *AMI did not rebut IBM's showing of originality in the contents of tape 2*

The evidence AMI offered to rebut IBM's showing of the originality of tape 2 does

not alter my conclusion. AMI's expert, Richard Belgard, admitted that he was "not an expert per se in the 3090 licensed internal code." Belgard, Tr. at 1373. Mr. Belgard drew his conclusions about tape 2 from an examination of the contents of "dumps" of tape 2, Belgard, Tr. at 1387–88. Yet when shown exhibits in a format similar to that he reviewed, a "hexadecimal" representation and a "EBCDIC" translation, Mr. Belgard was unable to give an opinion as to whether the exhibits contained a data listing or anything else. Belgard, Tr. at 1392–96. He said "I'm sorry, I can't make that determination. These could be data; this could be object code. Absent other context, I just can't tell. Could be nothing." Belgard, Tr. at 1396.

Mr. Belgard assumed the "install" and "remove" entries in the FRU table update file are directions to a human being rather than to the computer. Belgard, Tr. at 1399 ("those are directions to the field service person or customer engineer in order to make a change to the parts of the machine"). In testimony I credit, IBM's witnesses explained that "install" is an "instruction[ ] to the program on how to build internally the total FRU table," Hogan, Tr. at 1565, and "has nothing to do with the actual maintenance of the machine." Galler, Tr. at 1661. In addition, I noted earlier Mr. Belgard's erroneous assumption regarding the timing of the creation of tape 2 relative to the rest of the 3090 microcode. *See supra* n. 1.

## III. CONCLUSION

For the foregoing reasons, I will deny AMI's motion for partial reconsideration of my decision reported at 746 F.Supp. 520 (E.D.Pa.1990).